UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| DAVID BLASZCZAK, | ) |
| | ) No. 17 Cr. 357 (LAK) |
| THEODORE HUBER, | ) |
| | ) |
| ROBERT OLAN, and | ) |
| | ) |
| CHRISTOPHER WORRALL, | ) |
| | ) |
| Defendants. | ) |

**DEFENDANT ROBERT OLAN'S SENTENCING MEMORANDUM**

David Esseks
Eugene Ingoglia
Tobias Fischer

Allen & Overy LLP
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300

*Counsel for Defendant Robert Olan*

**TABLE OF CONTENTS**

I.     ROB OLAN'S BACKGROUND AND CHARACTER ............................................ 1

    A.    Rob's Family ............................................................................................. 4

    B.    High school ............................................................................................... 6

    C.    College ..................................................................................................... 8

    D.    Rob's Professional Career ........................................................................ 9

    E.    The "Most Involved, Devoted Husband and Father" ............................. 12

    F.    J███ , A██ , and E███ ............................................................................ 14

    G.    Rob's Devotion to His Family, Friends, and Community ...................... 17

II.    ROB OLAN AND THE OFFENSE CONDUCT ............................................. 28

    A.    Background ............................................................................................. 28

    B.    The 2012 Radiation Oncology Trade ..................................................... 29

    C.    The 2009 Radiation Oncology Trade ..................................................... 32

    D.    The 2013 Dialysis Trades ...................................................................... 35

          1.    The 2013 Proposed Dialysis Rule .................................................. 35

          2.    The 2013 Final ESRD Rule ............................................................ 36

    E.    2013 Home Health Trade – Visium ....................................................... 36

III.   THE ADVISORY SENTENCING GUIDELINES ......................................... 36

    A.    Base Offense Level ................................................................................ 37

    B.    Gain calculation ..................................................................................... 37

    C.    Mr. Olan Played a Minor Role in the Offense ...................................... 39

          1.    Mr. Olan's Understanding of the Scope and Structure of the Offense Conduct ........................................................................ 40

          2.    Mr. Olan Did Not Plan or Organize the Criminal Activity ............ 41

          3.    Mr. Olan Did Not Exercise Decision-Making Authority or Influence Those Who Did ....................................................... 42

          4.    The Extent of Mr. Olan's Participation in the Offense Conduct ........... 42

          5.    Incentive to Commit the Offense ................................................... 42

    D.    The Advisory Guidelines Calculation .................................................... 44

IV.   THE FACTORS IN 18 U.S.C. § 3553(a) COUNSEL IN FAVOR OF A SENTENCE FAR BELOW THE ADVISORY GUIDELINES ........................................... 44

    A.    The Nature And Circumstances Of The Offenses Of Which Mr. Olan Was Convicted Warrant A Below Guidelines Sentence ............................. 47

          1.    Role In The Offense ....................................................................... 47

          2.    Conviction Under Sections 1343, 1348, and 641 While Acquitted Under Section 10(b) .......................................................................... 47

B.     Rob Olan Is Fundamentally A Good Person and His Core Characteristics Warrant A Sentence Significantly Below the Advisory Guidelines .................. 48

C.     The Guidelines' Emphasis On Gain Leads To An Overstatement of Mr. Olan's Culpability And An Unjust Advisory Sentencing Range ................................... 50

D.     Mr. Olan Received a Tiny Portion of Deerfield's Trading Profits .................... 54

E.     Deterrence ........................................................................................................ 54

F.     A Sentence Significantly Below the Advisory Guidelines Range Is Necessary to Avoid Unnecessary Sentencing Disparities .................................................... 57

V.     MONETARY PENALTIES AND RESTITUTION ....................................... 59

A.     Criminal Forfeiture ......................................................................................... 59

B.     Criminal Fine .................................................................................................. 59

C.     Restitution ....................................................................................................... 60

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Apprendi v. New Jersey,*
    530 U.S. 466, 120 S.Ct. 2348 (2000)............................................................59

*Gordon v. United States,*
    No. 10 Cv. 5366 (KMW), 2011 WL 2638133 (S.D.N.Y. July 1, 2011)................................48

*Pepper v. United States,*
    562 U.S. 476, 131 S.Ct. 1229 (2011)......................................................44, 45

*Rita v. United States,*
    551 U.S. 338, 127 S. Ct. 2456 (2007)....................................................45, 48

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006)...........................................51, 53, 56

*United States v. Contorinis,*
    692 F.3d 136 (2d Cir. 2012)..................................................................39

*United States v. Emmenegger,*
    329 F. Supp. 2d 416 (S.D.N.Y. 2004)........................................................52, 55

*United States v. Gupta,*
    904 F. Supp. 2d 349 (S.D.N.Y. 2012)......................................38, 46, 49, 52

*United States v. Johnson,*
    No. 16 Cr. 457 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ................................49

*United States v. Maynard,*
    743 F.3d 374 (2d Cir. 2014).................................................................60

*United States v. Pfaff,*
    619 F.3d 172 (2d Cir. 2010).................................................................59

*United States v. Preacely,*
    628 F.3d 72 (2d Cir. 2010)..................................................................45

*United States v. Rajaratnam,*
    No. 09 Cr. 1184 (RJH), 2012 WL 362031 (S.D.N.Y. Jan. 31, 2012)........................38, 46, 53

*United States v. Zangari,*
    677 F.3d 86 (2d Cir. 2012)..................................................................60

**STATUTES**

18 U.S.C. § 3553 ............................................................................................... *passim*

18 U.S.C. § 3571 ...................................................................................................59

18 U.S.C. § 3663A .................................................................................................60

**SENTENCING GUIDELINES**

U.S.S.G. App. C, amend. 794 ...............................................................................40

U.S.S.G. § 2B1.1 .............................................................................................37, 44

U.S.S.G. § 2B1.4 .............................................................................37, 38, 44, 52

U.S.S.G. § 3B1.2 .........................................................................................39, 40, 44

U.S.S.G. § 3B1.3 ...................................................................................................44

U.S.S.G. § 3D1.2 ...................................................................................................37

U.S.S.G. ch. 5, pt. A .............................................................................................44

**OTHER AUTHORITIES**

S. REP. No. 112-244 (2012) ..................................................................................38

U.S. Sentencing Comm'n, 2017 Sourcebook of Federal Sentencing Statistics, tbl.
    27A ..................................................................................................................51

U.S. Sentencing Comm'n Public Hr'g Testimony and Transcripts (July 9, 2009)
    (Statement of Judge Jon O. Newman)... .......................................................51

U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing* (2004). ................56

Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*,
    61 Wayne L. Rev. 27 (2015).............................................................................56

Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines
    Sentencing Reform* (Punishment Purposes), 58 Stan. L. Rev. 67 (Oct. 2005).......................56

Press Release, U.S. Atty's Office, S.D.N.Y., *Four Defendants Convicted In
    Manhattan Federal Court For Stealing Confidential Government Information
    And Using It To Engage In Illegal Trading* (May 4, 2018)....................................55

Press Release, U.S. Atty's Office, S.D.N.Y., *Four Charged In Scheme To Commit
    Insider Trading Based On Confidential Government Information* (May 24,
    2017) ...............................................................................................................55

SENTENCINGS

*United States v. Afriyie,*
    No. 16 Cr. 377 (PAE) (S.D.N.Y. Sept. 5, 2017)................................................45, 51

*United States v. Aleksejev,*
    No. 11 Cr. 878 (LAK) (S.D.N.Y. Dec. 5, 2013), ECF No. 43.........................47, 51

*United States v. Chiasson,*
    No. 12 Cr. 121 (RJS) (S.D.N.Y. May 13, 2013)........................................45, 47, 49

*United States v. Contorinis,*
    No. 09 Cr. 1083 (RJS) (S.D.N.Y. Dec. 17, 2010)......................................46, 53, 51

*United States v. Fleishman,*
    No. 11 Cr. 32 (JSR) (S.D.N.Y. Dec. 21, 2011)................................................46, 53

*United States v. Gansman,*
    No. 08 Cr. 471 (MGC) (S.D.N.Y. Feb. 8, 2010) ..................................................46

*United States v. Emanuel Goffer,*
    No. 10 Cr. 56 (RJS) (S.D.N.Y. Oct. 7, 2011) ............................................37, 46, 47

*United States v. Zvi Goffer,*
    No. 10 Cr. 56 (RJS) (S.D.N.Y. Sept. 21, 2011)....................................................46

*United States v. Gross,*
    No. 15 Cr. 766 (GWG) (S.D.N.Y. Mar. 16, 2016), ECF No. 18 ...........................61

*United States v. Gupta,*
    No. 11 Cr. 907 (JSR) (S.D.N.Y. Oct. 24, 2012) ..................................................54

*United States v. Jiau,*
    No. 11 Cr. 161 (JSR) (S.D.N.Y. Sept. 21, 2011)............................................46, 49

*United States v. Kimelman,*
    No. 10 Cr. 56 (RJS) (S.D.N.Y. Oct. 12, 2011) ....................................................46

*United States v. Koulouroudis,*
    No. 09 Cr. 440 (PGG) (S.D.N.Y. Apr. 9, 2010), ECF No. 31 ..............................56

*United States v. Martoma,*
    No. 12 Cr. 973 (PGG) (S.D.N.Y. Sept. 17, 2014) ...............................................45

*United States v. Newman,*
    No. 12 Cr. 121 (RJS) (S.D.N.Y. May 2, 2013)....................................................46

*United States v. Riley,*
    No. 13 Cr. 339 (VEC) (S.D.N.Y. Apr. 27, 2015) ......................................45, 49, 52

*United States v. Robert Stewart,*
No. 15 Cr. 287 (LTS) (S.D.N.Y. May 4, 2016), ECF No. 95................................................49

*United States v. Sean Stewart,*
No. 15 Cr. 287 (LTS) (S.D.N.Y. Mar. 17, 2017).......................................................45, 49, 52

*United States v. Walters,*
No. 16 Cr. 338 (PKC) (S.D.N.Y. Aug. 2, 2017)............................................................45, 49

*United States v. Whitman,*
No. 12 Cr. 125 (JSR) (S.D.N.Y. Jan. 24, 2013)...........................................46, 49, 57, 52, 58

## PRELIMINARY STATEMENT

Rob Olan is an extraordinary person.  He unfailingly demonstrates a constellation of qualities we all strive for but seldom attain.  He is selfless, a leader in times of crisis, a man from whom fathers want their children to learn.  "[A] genuinely good human being."  (Steve Landers Letter, Ex. A-28.)  "[A] dedicated husband and family man."  (John Peters Letter, Ex. A-7.)  "[T]he definition of a 'solid human being' . . . ."  (Michael Kramer Letter, Ex. A-32.)  "[T]he reason someone believes in the goodness of people."  (Heather Morgan Letter, Ex. A-10.)  "[A] symbol of what kindness should be."  (Brian Bizoza Letter, Ex. A-18.)  "[A] good man in the purest sense of the word."  (Carrie Berg Letter, Ex. A-25.)  "[K]ind, generous, honest, selfless and a strong family man with old-fashioned values."  (Ingrid Schweiger & Joe Janisaitis Letter, Ex. A-5.)  "[O]ne of the finest people I have met . . . ."  (Abraham Kometz Letter, Ex. A-39.)  A "superhero in everyday clothes."  (Heather Morgan Letter, Ex. A-10.)

In sentencing Rob Olan, we ask the Court to take account of the man as a whole, and place the offense for which he must be sentenced in the context of how he has lived his life.  Because Rob Olan has led an exemplary life, because he is no threat to commit any crimes in the future, and because he was not the driver of any of the conduct at issue in this case, we ask the Court to impose a sentence significantly below the advisory Guidelines range.

## I.       ROB OLAN'S BACKGROUND AND CHARACTER

Rob Olan defies Wall Street stereotypes.

- "Unfortunately, the broadly defined Wall Street ecosystem is filled with lots of successful people who I don't like, don't respect and don't trust.  There is an over-abundance of ego, testosterone, entitlement and greed.  Rob stands in stark contrast to all of these stereotypes.  He is a smart, ethical, regular guy who never lost sight of how fortunate he

was to have lucked into a job that was so lucrative yet so gratifying." (Leslie Henshaw Letter, Ex. A-8.)

- "[W]hen I reflect upon the characters of the many people that I meet in my professional life, I ask myself if I would invite them to my home.  Unfortunately, in too many instances the answer to that question is no.  I can tell you without equivocation that in the case of Rob Olan, the answer is an emphatic yes.  Why?  Because I have seen him in action and I want my own children to be exposed to and learn from adults of integrity, humility and humanity." (Hans C. Vitzthum IV Letter, Ex. A-9.)

- "Working on Wall Street, it is easy to get caught up in the greed and excess that it presents.  In all of my talks with Rob over the last twenty years, it was apparent that he never likened to that lifestyle, remaining humble and modest." (Craig Warner Letter, Ex. A-17.)

- "[A]s Rob's career in finance back in NY started to take off, he remained as humble and down to earth as ever.  Quite the opposite of many people I know that have achieved great success in finance." (Andrew Javorksy Letter, Ex. A-6.)

- "As years went by and Robert achieved success in his financial career, he remained humble and unchanged. He maintained his strong family values, loyalty to his friends and strong devotion and love for his siblings and parents." (Phyllis & Howard Javorsky Letter, Ex. A-11.)

- "Over and over again, I have and still meet people who know Rob and have no idea he was in the hedge fund industry.  One friend who commuted every[ ]day for years on the same ferry with Rob said recently to me, 'I thought Rob was a doctor or something.  I had no idea he was in finance.  So not a finance guy.'  For anyone who knows Rob, they

know him to be simple and earnest, often with a smirk forming on his lips as he thinks of something that makes him laugh."  (Andrea Olan Letter, Ex. A-3.)

- "Rob was never motivated by money in all the years I worked with him, never expressed dissatisfaction with salary or bonus, never came to us with a competing offer in order to get a salary increase – his reputation was much important to him than that. (Needless to say, that is not the general rule on Wall Street.)"  (Alex Zisson Letter, Ex. A-19.)

- "Rob is a good man in the purest sense of the word.  In an industry that can be full of egos and competition, Rob is always tethered to reality and appreciative of his good fortune.  This fortune is well-rounded:  he is extremely intelligent, has a lucrative and successful career, has many friends, and a healthy and happy family.  Refreshingly, with all of these blessings, he is humble.  He attributes it all to 'good luck'.  He has an accurate sense of self and is very content."  (Carrie Berg Letter, Ex. A-25.)

Indeed, the Court got a brief glimpse into Rob Olan's non-Wall Street character at trial, through an email exchange between Mr. Olan and Mr. Fogel from 2011 concerning an unsuccessful trade.  Of particular note is the portion of the email that was redacted at trial.  In the email exchange, Mr. Fogel cursed Mr. Olan for what Mr. Fogel perceived as criticism of him after the unsuccessful trade, and went on to lament various difficulties of his life.  (*See* DX2597, Ex. B (Mr. Fogel complaining variously of "serious pinch on finances," including taxes and expenses such as "wedding up my ass" and losses in short positions in his personal account).) Mr. Fogel finished his email with a suggestion that Rob perform a biologically impossible scatological act.  (DX 2597, Ex. B.)

Mr. Olan's response demonstrates the character traits—humility, generosity of spirit, level-headedness—that have been described in the letters submitted on his behalf.  In his

3

response, Mr. Olan took responsibility for the trading decision and counseled Mr. Fogel to keep it in perspective.  (DX 2597, Ex. B ("We've had a good y[ea]r and you've had a good y[ea]r and we got this one wrong so far. . . . .  Not a big deal.").)  Then he took a moment to respond to Mr. Fogel's personal comments:

> On personal stuff, I'm not sure what your financial situation is like.  I'm guessing even if you took a hit you're better off than 97% of Americans and 99% of the world, and you're a young motherfucker – you've got a lot of earning ahead of you.  You're about to get married to a woman you love who is too foolish to realize you're a donk.  You take more vacation than retired people.  You got a lot of good stuff happening.  Enjoy it.  If you're really in a financial pinch or have concerns you want to talk about, I'll help you out, no questions asked.

> Point is, keep this in perspective. . . .  You've got a good job and work with some great people in one of the best places to live in the world.  You're healthy, getting married, an intact family, sweet apartment, weakass grill.  It's pretty fucking good.

(DX 2597, Ex. B.)  Mr. Olan's response shows his perspective on work, Deerfield, trading, and his good fortune.  It is a window into his mindset and character that resonates perfectly with the portrait of Mr. Olan that comes through in the letters excerpted above and described further below.  Mr. Olan is no greedy, aggressive Wall Streeter.  He is a humble, decent, caring, family-focused man who has at all times been conscious of his good fortune and devoted to helping his family, his community, and those less fortunate than himself.

We expand on these qualities below in order to inform the Court's understanding of Mr. Olan as it prepares to sentence him.

### A.    Rob's Family

Fleeing east from the Nazis, Rob's grandparents took refuge in what is now Uzbekistan.  Rob's father was born in a displaced persons camp in Tashkent.  With nothing but the clothes on their backs, the family moved to the United States when Michael was five years old.  Like many

who fled from the Holocaust or the pogroms of Russia, the Olans settled in south Brooklyn and built a life for themselves there.

Michael and his wife Susan raised three children:  Rob, the oldest, and his sisters Erica and Andrea.  When Rob was two years old, the Olan family moved to East Brunswick, New Jersey.  Rob's father spent his days working and his nights juggling the demands of his courses at Rutgers Law School.  Rob's father later worked as an accountant.  His mother worked as a school nurse.  They "were very hard working, middle-class parents," (Susan Olan Letter, Ex. A-2), who tried to make ends meet, all in hope for a brighter future for their children.

Despite their family's focus on hard work, Rob and his sisters "were raised happily in a middle class home that valued relationships over material items."  (Erica Olan Letter, Ex. A-4.) Rob would remain close with his grandparents his whole life, visiting them on the weekends even long after his grandmother could no longer recognize him.  (Eileen & Stuart Bohrer Letter, Ex. A-14.)  From them, Rob learned the importance of family, tradition, and charity.

These lessons were reinforced by Rob's father, who taught Rob "about responsibility and the importance of taking care of his family," (Ingrid Schweiger & Joe Janisaitis Letter, Ex. A-5), and about the virtues of hard work, preparation, attention to detail, and, most importantly, acting with integrity.  (John Peters Letter, Ex. A-7.)  As a friend explains,

> I know that this integrity is deeply rooted in Rob because I saw where it came from:  his father.  . . . He told his three children to stand out by working harder, by being prepared, by being detailed oriented.  He told them to do the work.  Rob reflected often on his dad's simple principles.  It guided his professional ethics.

(John Peters Letter, Ex. A-7; *see also* Andrea Olan Letter, Ex. A-3 ("Rob inherited many of our dad's finest qualities.  Rob doesn't publicize when he does right.").)

Like his father, Rob worked while attending school.  (Susan Olan Letter, Ex. A-2 ("Outside of school, Rob was always industrious, holding several jobs.  He worked at a fast food

restaurant in the summer and cut Christmas trees in the freezing days of winter.  He had a paper route and cut lawns during the school year and did many chores around the house, which was required since I worked full time as a nurse.").)

### B.      High school

Rob attended East Brunswick High School where he earned the respect of peers and teachers alike.  He was a devoted friend.  Phyllis Javorksy, one of Rob's high school teachers recalls that

> Robert was well respected by his peers and teachers for his intellect, diligence as a student, sharp sense of humor, athletic ability as a varsity soccer player and his positive interaction with his fellow classmates.  He was that well rounded kid who fit in with so many different types.  He was smart, but also very social.  He knew how to make others comfortable in his presence.  To me, that was a special gift that he possessed.  He was never condescending or exclusive in his choice of friends.

(Phyllis & Howard Javorsky Letter, Ex. A-11.)

Admiration for Rob was shared by his peers, too.  Rob was a "tremendous role model" who "put family and close friends above all else, was smart, intuitive, and extremely kind...an athlete and an academic, wise and responsible behind his years...he was cool and well-liked and respected by so many cliques without trying."  (Heather Morgan Letter, Ex. A-10.)  He was "a trusted friend and confidante.  In our early years he was someone our group of friends looked up to: very smart and studious, honorable, level headed, and always doing the right thing."  (Michael J. Hartman Letter, Ex. A-33.)  And he "was a great student and set the example that his sisters followed.  He was an A student through high school and was also a varsity athlete.  He was friendly or friends with everyone.  I truly have never heard anyone say a disparaging word about him."  (Matthew Cohen Letter, Ex. A-22.)

It was not only Rob's athletic ability that earned him the respect and admiration of his peers on the soccer field.  "He was the guy . . . who took an assist and let a teammate score a goal on the soccer field . . . ."  (Heather Morgan Letter, Ex. A-10.)  Even in the midst of heated soccer matches, Rob always was poised, respectful, and a leader.  (Andrew Javorsky Letter, Ex. A-6.)

> [T]here literally was not a single instance where Rob would question the referees or get involved in any of the heated banter between players.  Rob was always the peacemaker and the guy that separated two opposing players about to be involved in a scuffle.  He believes in avoiding confrontation and conflict and favors the amicable and peaceful solution.

(*Andrew Javorsky Letter*, Ex. A-6; *see also* Heather Morgan Letter, Ex. A-10 ("He was the guy who kept his wits about him and exercised good judgment at a party . . . .").)

A perennial role model, Rob's work ethic was an inspiration to his friends who would try to emulate it.  In addition to studying and soccer, Rob held a number of part-time jobs, inspiring friends to join him.

> Whatever job Robert took on, I tended to follow him into it soon thereafter.  That included:  mowing lawns, delivering newspapers, delivering pizza, valet parking and, both of our favorites, cutting down Christmas trees.  It's hard to explain how valuable it was for me to learn from that work ethic as it was easier to find in the Olan family than in my own.  Robert's willingness to work was evident around the house and our neighborhood as well.  One summer when we were both home from college, my father decided to build a deck in our backyard.  My dad was handy, couldn't afford to pay someone to do the job and had two teenage sons to help.  He also had the benefit of a neighbor who spent every spare moment helping us.  Robert worked day and night to help that deck get built.  That's just who he was then and who I believe he continues to be.  If there's a job to be done or if a friend needs a hand, Robert doesn't need to be asked for help.

(Matthew Cohen Letter, Ex. A-22.)

When another childhood friend moved from East Brunswick to California, Rob didn't need to be asked to be there to help him through the loneliness of starting over:

> At fifteen, my family made a cross country move that would have been relationship ending for most teenage boys.  However, with Rob, distance didn't put an end to our friendship.  There was a mutual valuation of character and life experience.  As you get older, you fine tune your sense of what matters in a friend. Rob's honesty, authenticity and caring way have made our friendship one of the few I have held dearly all these years.

(Craig Warner Letter, Ex. A-17.)  Even in high school, Rob "was there to help you in a bind even before you asked."  (Heather Morgan Letter, Ex. A-10.)

### C.    College

Rob attended Cornell University and studied economics and Japanese, rowed crew, and again applied the values instilled in him from a young age:  hard work and service to others.  As he did at East Brunswick High School, and again later as a professional, Rob earned the admiration of his college classmates by exhibiting the "core qualities and character" that define him to this day:  "an unassuming and humble nature, a strong and thoughtful sense of integrity and a deep commitment to his family and community."  (Zachary Enterlin Letter, Ex. A-21.) Another classmate recalls, "Cornell University exposed me to deep-seated traits in Rob's character that have been true of him since.  He believes in hard work and pulling his weight.  He scoffs at short cuts."  (John Peters Letter, Ex. A-7.)  For example,

> At college, Rob tried out for and made the crew team, which had a reputation for grueling fitness training.  Crew as a sport aligns well with Rob's character: discipline to handle monotony and repetition at practice, and the importance of team players.  Incredibly, Rob ran to and from practice.  This is noteworthy, not only because it is cold most of the year in Ithaca, but, after long and painful practices, getting home from Cayuga Lake meant running up a steep hill.

(John Peters Letter, Ex. A-7.)

### D.      Rob's Professional Career

"Rob has only held two jobs as an adult." (Jenn Olan Letter, Ex. A-1.) Before Deerfield,

Rob worked as a research analyst at the investment bank Hambrecht & Quist,[1] a job Rob

received after responding to an advertisement in the *New York Times*. (*See* Alex Zisson Letter,

Ex. A-19 (further noting that at his interview, "Rob immediately impressed me as a serious,

thoughtful, and mature person for any age, and especially for a recent college graduate.").)

Rob started at Hambrecht & Quist in 1993 as a junior research analyst covering

pharmaceutical companies. (Richard Van den Broek Letter, Ex. A-24.) "From day one on the

job Rob was insightful, talented, diligent, and honest." (Richard Van den Broek Letter, Ex. A-

24.) Another former colleague describes Rob as

> an excellent colleague – unfailingly thoughtful, keenly attentive to detail, a very
> hard worker, and most importantly, totally fair and honest. All these traits led to
> multiple promotions, and he was considered one of the best hires at the firm –
> both by his new colleagues and from all the companies and investors with whom
> he interacted. Rob was well known as one of our most level-headed and
> straightforward analysts – especially noteworthy for a period (the late 1990s)
> when hyperbole to curry favor with companies was widespread on Wall Street.
> Rob earned his reputation as a scrupulously honest analyst.

(Alex Zisson Letter, Ex. A-19; *see also* Richard Van den Broek Letter, Ex. A-24 ("Importantly,

in our three years together Rob never shirked the hard work required to do a job properly.")

Despite all Rob's success, "he remained humble and unchanged. He maintained his strong family

values, loyalty to his friends and strong devotion and love for his siblings and parents." (Phyllis

& Howard Javorsky Letter, Ex. A-11.) "Quite the opposite of many people I know that have

achieved great success in finance." (Andrew Javorksy Letter, Ex. A-6.) Rob "wasn't like the

other analysts" in other ways, too: "There was a quietness to him, a deep commitment to

intellectual rigor and to producing work that he could proudly stand behind." (Howard Furst

---

[1] Through a series of acquisitions of Hambrecht & Quist, Rob would perform the same role at J.P. Morgan Chase.

Letter, Ex. A-15.)  Rob "was a presence in a room, not because of any showiness but because of its distinct absence . . . ."  (Howard Furst Letter, Ex. A-15.)  "Furthermore, in comparison with other analysts and investors, . . . Rob [was described as] among the top with regard to honesty and transparency."  (Ben Gong Letter, Ex. A-38.)

As a sign of Rob's success, in 2002, Rob was recruited to join Deerfield by its founder, Arnie Snider, a client of Rob's at the time.  After substantial consideration, Rob accepted Arnie's offer and moved to Deerfield.  He did it not for money or ambition, but because Arnie Snider had a reputation for having built Deerfield around his system of values, which were values shared by Rob.  A former colleague recounts:

> We would have loved to keep Rob at the firm, but when we learned that he was being personally recruited by Arnie Snider at Deerfield, we knew it was impossible.  Arnie was a legend in our field, and was regarded as one of the most kind-hearted and ethical of investors.  He was extremely picky in his hires, and with his reputation he could afford to consider only the cream of the crop.  It was no surprise to us that Rob made the cut.

(Alex Zisson Letter, Ex. A-19.)

Throughout his career, Rob distinguished himself through hard work, his keen intellect, and his ability to focus on what matters most.  "Rob got noticed by a place like Deerfield because he put in the time.  He logged the hours at his job, reading everything available to be read, doing the work.  He works harder.  He doesn't skirt his job or cut corners."  (John Peters Letter, Ex. A-7.)

Rob's "thoughtful and diligent" approach to research and analysis gained him the universal respect of his peers.  (Adam Greene Letter, Ex. A-20.)

> [H]is focus has always been on identifying emerging investment themes and trends, and then choosing to invest for the long-term in the companies he feels are best positioned to benefit from these themes/trends over the subsequent 5-10 years.

(Richard Van den Broek Letter, Ex. A-24.)

> He didn't make decisions with swagger, knee jerk reaction or a swing for the fences mentality. His research was deliberate and multi-faceted and his appetite for risk was most definitely on the low end of the continuum. He presented well-reasoned views at our morning meetings and in instances where he may have disagreed with a colleague, he presented his position with confidence but never impolitely, arrogantly or with an unwillingness to hear out other perspectives. His research was thorough and premised on multiple inputs. He engaged the way we want our model to work... that more data points are better than fewer, that the sum of different perspectives yields better collective insights and that a team approach lowers risk, improves outcomes and creates a differentiated perspective.

(Leslie Henshaw Letter, Ex. A-8.)

> Rob is truly an independent thinker who was never afraid to challenge an input or an idea. I saw this first hand every day during our morning investment meeting which is designed to encourage discussions and debates and to let individuals voice their views. . . . Rob was always looking to verify information that was presented by others and never took anything at face value. No matter how senior or junior the person was that presented the idea or information, Rob always processed the information thoughtfully and carefully considered all vantage points before responding to the individual with an honest assessment that Rob delivered with kindness and respect. . . . He understood there were no shortcuts. He diligently researched for answers and looked to substantiate all inputs. His investment decisions were based on multiple inputs and thorough models that were driven by comprehensive research. As someone new to the buy side when I started at Deerfield, I had a tremendous amount of respect for the way he approached his work.

(Adam Greene Letter, Ex. A-20.)

> I remember meeting Rob when I was a young, inexperienced analyst who just entered a whole new industry after spending four years in medical school. With no pretense, he always had a warm smile and heartfelt greeting for me and plenty of time and patience to answer even the most basic of questions. His intelligence, guidance and thoughtfulness about solving problems were instrumental in helping me find my way as an investor, and I fondly remember recognizing his face in crowd during some very busy meetings and our subsequent lighthearted debates about various investments across the healthcare sector.

(Brian Bizoza Letter, Ex. A-18.)

> Rob "loved and was passionate about his work. He felt proud of the firm's culture and its
>
> charitable foundation. He enjoyed researching, observing and influencing health care

companies. He found the work challenging and fulfilling, and he worked hard at it." (Jenn Olan Letter, Ex. A-1.) His sense of fulfillment came, in part, from his broad view of the role he and his colleagues performed:

> Rob has always recognized that patient care and patient safety are the most important considerations and we have spent a lot of time over the years puzzling why certain clearly superior medical interventions were not being embraced by the health insurers and physicians as fully as would be warranted by the proven clinical results. Rob believes that the capital markets should help address that deficiency, which is one of the reasons he always worked so diligently.

(Leslie Michelson Letter, Ex. A-31.)

### E.    The "Most Involved, Devoted Husband and Father"

"While Deerfield formed the core of Rob's waking hours, it was his family that dominated his heart." (Leslie Henshaw Letter, Ex. A-8.) "[N]otwithstanding long hours and a demanding travel schedule, [Rob's family] always came first. (Leslie Henshaw Letter, Ex. A-8; *see also* Jenn Olan Letter, Ex. A-1.)

In April 2001, Rob and Jenn met here, in New York City. (Jenn Olan Letter, Ex. A-1.) To Jenn, it was apparent from the moment they met that "he was a good man with strong family values . . . ." (Jenn Olan Letter, Ex. A-1.) They married in 2003 and now have three children: J█ (age 12), A█ (age 10), and B█ (age 8). (Jenn Olan Letter, Ex. A-1.)

With respect to each of their children, "Rob made it a point to attend every important doctor's appointment" when Jenn was pregnant and he was present for each of their births. (Jenn Olan Letter, Ex. A-1.) Jenn's mother and stepfather note that "[f]rom the time of the birth of his first child, we have often observed Rob coming home from work and 'rolling up his sleeves' to participate in the daily routines with all of the children. He remains the most involved, devoted husband and father we have ever witnessed." (Ingrid Schweiger & Joe Janisaitis Letter, Ex. A-5.) Jenn elaborates,

Rob participated in all of the tasks and chores related to caring for our kids when they were babies and toddlers – both the good and the not so good. When the kids were babies, Rob and I took turns waking up during the night to feed them. Rob changed diapers, he went to pediatric appointments, he stayed up through the night to help care for the kids when they were sick, and he also read to them, played with them, took walks with them and simply cuddled with them. He was and continues to be a hands-on father, always present and eager to be involved.

(Jenn Olan Letter, Ex. A-1.)

As the years passed and the Olan family grew, they decided that they

needed to move, as their apartment was too small for a growing family. They thought moving to the suburbs might provide the best option but Rob worried about being able to get home in time to see the children before they went to bed, something that was easier to accomplish in Manhattan where he worked. They decided to move to New Jersey, where they would be closer to his parents and sisters. Rob began awakening early, was out of the house by 5am, thus getting to the office by 7 am, following a 90-minute commute, working on the commuter ferry[, ]ensuring that he'd be home early enough to help, and have dinner with his family. He prioritizes his children's school conferences, plays, and athletic events. He coaches his children's soccer teams.

(Marc J. Schweiger Letter, Ex. A-44.) Jenn's letter sheds more light on Rob's priorities and

provides an intimate look into how he has chosen to live his life:

For as long as Rob worked at Deerfield, he would leave early in the morning to get to the office and, with rare exception, he would be home for dinner, returning to work items later in the evening as needed. It was important to him to get home to spend time with the kids before they went to sleep and to help me with the household tasks. If he were ever running late in the evening, he would call to let me know. He would always check with me before committing to any work travel – he didn't want to miss any of the kids' important events and wanted to make sure it did not conflict with any of my commitments. When he did have to travel for work, he would insist on scheduling an itinerary that was not only as short as possible, but also inconvenient for himself (i.e. flights late at night or first thing in the morning) so as to maximize his time at home. He would hardly ever stay in New York to socialize after work, instead preferring to get home to be with the kids and me. His attitude as both a husband and a father has always been that family comes first.

. . .

Rob enjoyed and was proud of his work at Deerfield, but his general attitude about work never changed. Work always came second to family. Anyone who knows Rob knows that. No matter how important the firm or the work or the title,

family came first.  His commute was close to two hours each way, but that was worth it to him to be in a town close to our extended family.

(Jenn Olan Letter, Ex. A-1.)

      **F.**        **J████ A███, and E████**

"You can tell a lot about people by getting to know their children."  (Sarah & J.B. Kiley Letter, Ex. A-16.)  J███, A███, and E████ "are three of the most well-mannered, courteous and respectful kids [in their] town."  (Brett Marcus Letter, Ex. A-13.)  The Kileys, whose children are friends with J███ and A███, know them to be "unfailingly polite, smart and engaging young men.  Neither is ostentatious, or boastful, despite their excellence in both the classroom and on the sports fields and gyms.  They are hard workers, humble, honest, and good friends to our boys."  (Sarah & J.B. Kiley Letter, Ex. A-16.)

It is "no accident" that his children receive such high praise, too—"Rob and Jenn are incredible parents and role models."  (Brett Marcus Letter, Ex. A-13.)  Rob, like his father and grandfather before him, prioritizes "spending time with his immediate and extended family and raising children who appreciate what is most important in life – good health, family and being an honest, appreciative and charitable person.   He consistently models these values to our kids through his own behavior."  (Jenn Olan Letter, Ex. A-1.)  Rob "sets a high standard for his kids with regards to honesty and teaches by example."  (Sarah & J.B. Kiley Letter, Ex. A-16.)  Jenn's sister has observed "Rob, on many occasions, speaking lovingly yet firmly with each of the children while discussing the importance of doing the right thing, being an honest and good person, and the importance of being a kind, fair and moral person, for these are the values Rob lives by."  (Rebecca Schweiger Letter, Ex. A-29.)

14

Rob truly relishes fatherhood.  Indeed, "Rob is involved in every aspect of the children's daily lives:  homework, sports, meals, medical appointments, religious training, social lives, etc." (Ingrid Schweiger & Joe Janisaitis Letter, Ex. A-5.)  As Jenn explains, Rob

> lives his life based on the philosophy that, as long as our kids are young enough to have interest in spending time with him, he should enjoy that time and be there for them.  He and I both know there will come a time, perhaps before long, when our kids have less interest in spending time with us, and at that time we can spend more time exploring our personal hobbies and interests.

(Jenn Olan Letter, Ex. A-1.)

To those who know him, Rob's dedication to his children is one of his defining traits. Instead of playing golf, Rob spends his weekends "on the sidelines at his kid's sporting events, either coaching or cheering.  Like most towns, the same dads (and moms) are helping out every season, every sport.  That's Rob."  (Brett Marcus Letter, Ex. A-13.)

Listening to Rob talk about his children does indeed reflect where his priorities lie.  You would learn that "he had already done the math on how many family vacations he had before his young kids were off to college and out of the house."  (Brett Marcus Letter, Ex. A-13.)  To Rob, this was not just a thought experiment but an expression of his yearning "to cherish each vacation and appreciate every moment that he got to spend with his kids."  (Brett Marcus Letter, Ex. A-13 (noting "I don't know a person from town who values his time with his family more than Rob.").)  Having had many such conversations with Rob, a colleague writes:

> My personal experience has been that listening to a person speak about one's family and his dreams and aspirations for his children offers accurate insight into the nature of his character.  Over the course of many hours and days in one on one activities outside the office, I have been able to piece together a fulsome understanding of Rob's value system and it is one worthy of admiration.  He has worked hard instill [sic] in his children the notions of hard work, self-determinism and respect.  On many occasions he has articulated his desire that they develop into young adults appreciative of their circumstances and devoid of a sense of entitlement or self-satisfaction.

(Hans C. Vitzthum IV Letter, Ex. A-9.)

At the end of the day, what matters most is that Rob and Jenn have created for their children a home in which they feel secure, supported, and loved.  But that safe place will soon change irreparably.  J█████, A████, and B████ "sense the impending trauma – their anxiety levels are high."  (Darpan Kapadia Letter, Ex. A-23.)  They "are old enough to understand the legal peril and career situation that he is in and to experience the related social stigma.  At the same time, they are young enough to be deeply affected by his absence and . . . will suffer significant emotional trauma without a father at home."  (Jenn Olan Letter, Ex. A-1.)  Indeed, one of Rob's children ███████████████████████████████████████ (John Peters Letter, Ex. A-7.)

As Jenn writes,

> the idea of Rob being separated from our kids is devastating.  Each of our kids has their own special and meaningful relationship with Rob.  . . .  J███ has always been very mature (people comment that he is "wise beyond his years") and inquisitive.  He and Rob enjoy spending time playing basketball or soccer together, while having a serious conversation about anything from politics to current events to weather patterns to skiing.  J███ asks many questions and Rob almost always has ready answers for him.  Our younger son, A███, has a very silly side that he expresses only at home and particularly with Rob.  Rob is only too happy to break out his silly side in return, and the two of them have a lot of laughs together.  A███ is in the beginning stages of studying and planning for his Bar Mitzvah, which will be in the Fall of 2020.  Our daughter, B████, is a true "daddy's girl".  It is not unusual to find Rob and B████ playing soccer together, playing a board game or cuddled up on the couch watching a movie.

(Jenn Olan Letter, Ex. A-1.)  "Among the many things that keep [Jenn] up at night, when [she] thinks about the possibility of Rob having to serve prison time," is racing a nearly anaphylactic child to the emergency room alone.  (Jenn Olan Letter, Ex. A-1.)  J███ and A███

███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████



Whether missed Bar Mitzvahs, father-daughter dances, or other milestones, Rob's

absence from their lives for any period will have profound consequences for the Olan family that

"would be ruinous and permanent."  (Randy Michelson Letter, Ex. A-30.)

### G.    Rob's Devotion to His Family, Friends, and Community

"Rob has always distinguished himself by his generosity."  (Albert Saad Letter, Ex. A-

26.)  "[H]e never looks for credit or recognition."  (Jenn Olan Letter, Ex. A-1.)  Rather, Rob's

"generosity comes out of a deep caring and empathy for those around him."  (Eileen & Stuart

Bohrer Letter, Ex. A-14.)

In one example, Rob's sister

Andrea and her husband were looking to move their young family to the suburbs
close to their parents and siblings in New Jersey . . .  [but] weren't in the financial
position to buy a home.  And even though Rob's parents wanted to help her buy
the home, unfortunately they also weren't in the position to help Andrea pay for
it.  In typical Rob fashion, he stayed under the radar and found a way to make
everyone happy.  He lent the money to his father who in turn lent the money to
Andrea to buy the house.  This way, his dad was able to make the gesture to his
daughter and Rob could just be in the background behind the scenes.  Again,

> typical Rob Olan.  Always there to help yet never needing the praise or the recognition or anything in return.  Selfless and generous.

(Andrew Javorsky Letter, Ex. A-6.)  Unsurprising, Rob never told Andrew about what he did for his sister.  Rather, Rob's parents told their close friends and neighbors, Phyllis and Howard Javorsky, who in turn told their son, Andrew.  (Andrew Javorsky Letter, Ex. A-6.)  As the Javorskys explain, Rob

> was so generous to his entire family and never flaunted his success and wealth to anyone.  If we hadn't been as close to his parents, we would never have been privy to these acts of total generosity and selflessness.  That being said, we were not at all surprised by this, knowing how devoted a son and family member Robert has always been and continues to be.

(Phyllis & Howard Javorsky Letter, Ex. A-11.)

For Rob, pure altruism is a matter of routine.  He later "created college accounts for [Andrea's] three children, making regular deposits, and only told her about it after his conviction so that she is able to account for that in their planning.  The amounts should fund several years of college per child."  (Jenn Olan Letter, Ex. A-1.)  He gives selflessly, motivated solely out of concern for the wellbeing of others and a "desire to relieve [others] of any of [their] burdens." (Eileen & Stuart Bohrer Letter, Ex. A-14; *see also* Jenn Olan Letter, Ex. A-1 ("I have seen, in each of these instances, how happy it makes Rob to be able to provide help to family members, and there are never strings attached.").)

When it was time for his parents to move to a retirement community, Rob purchased their home and later offered it to Jenn's mother and stepfather, free of charge.  (Andrew Javorsky Letter, Ex. A-6; Ingrid Schweiger & Joe Janisaitis Letter, Ex. A-5.)  It was only a few blocks away from where Rob, Jenn, and the children lived and Rob "wanted to be closer to family and wanted his kids to be close to their grandparents," (Andrew Javorsky Letter, Ex. A-6), and wanted his in-laws to "enjoy being part of the children's lives and [to] be included in all of the

family activities."  (Ingrid Schweiger & Joe Janisaitis Letter, Ex. A-5.)  Rob "made it possible

for [them] to live in an area that we would otherwise not be able to afford."  (Ingrid Schweiger &

Joe Janisaitis Letter, Ex. A-5.)  "Over the years, many of our neighbors have successfully sold

their homes, but Rob has never once suggested that we move so that he can sell the home we are

in.  He has made clear that it is more important for us to live close to him, Jenn and their kids."

(Ingrid Schweiger & Joe Janisaitis Letter, Ex. A-5.)

       Rob gave a car to member of his extended family "who was unemployed and living with

[Rob's wife's] elderly [grand]parents.  She was in need of a car but couldn't afford one, so Rob

gave one to her.  As is typical of Rob, he did not look for credit or thanks; on the contrary, he

shied away from it."  (Ingrid Schweiger & Joe Janisaitis Letter, Ex. A-5.)

       The letters are replete with other examples. (*See, e.g.*, Erica Olan Letter, Ex. A-4

(encouraging colleagues to donate to funds to allow a personal assistant to purchase a computer

for her son who needed one); Heather Morgan Letter, Ex. A-10 (describing Rob's giving to help

save a friend's synagogue); Adam Greene Letter, Ex. A-20 (describing Rob's dedication to the

Deerfield Foundation as the motivation for his participation); Kevin Conroy Letter, Ex. A-45

(describing Rob and Jenn's support for "the American Cancer Society, the Rumson Education

Foundation, and Hand in Hand, an organization devoted to supporting special needs teens in

need of friendship and companionship" and noting "Rob is a genuinely kind, caring person who

has given back to his community and society in many ways."); Rabbi Laibel Schapiro Letter, Ex.

A-36 (describing Rob and Jenn as "stellar supporters and active participants of Hand in Hand").)

       And yet, "Rob offers so much more than financial support."  (Andrew Javorsky Letter,

Ex. A-6.)  "Rob is consistently generous with his time and emotional support and is always ready

to lend a helping hand." (Ingrid Schweiger & Joe Janisaitis Letter, Ex. A-5.) That helping hand

is ready whether the person in need is a family member, friend, or total stranger:

> Several years ago, I planned to meet Robert at a train station for a weekend visit
> to our home. The train arrived but Rob was nowhere to be seen. Eventually, I
> found him beside a man who was speech and hearing impaired. I witnessed my
> son arrange and pay for transport home for this stranger. It was heartwarming to
> see this firsthand, but it was not surprising. Rob always quietly helped others.
> Whether it was a stranger who needed some guidance, a grandparent who needed
> some companionship, a cousin who needed help buying a car, or a sibling who
> needed some assistance getting settled after college, Rob was always generous,
> compassionate and happy to help.

(Susan Olan Letter, Ex. A-2); *see also* Jenn Olan Letter, Ex. A-1 (describing the event as "not an

outlier but simply the way he does things. Rob consistently goes out of his way to help and show

compassion toward others").) Another example comes from a neighbor whose child Rob helped

her time of need:

> My family's first interaction with Rob came before we met formally. My
> daughter (R███) and wife (Liza) were at a local park watching my son play soccer
> on a late summer day. R███, who was three at the time, got her finger stuck in a
> metal picnic table. She began to cry. My wife was in a bind because she could
> not get our daughter's finger out of the table, and she didn't want to leave our
> daughter to get help. Rob, who was a stranger at the time, calmly came over to
> the table and tried to pull R███ increasingly swollen finger out of the table.
> When that failed, he called the police for help before spotting an officer in the
> park. He stayed with Liza and R███ until R███ finger was removed from the
> table to make sure R███ was okay. That event demonstrated Rob's best qualities,
> empathy to a mom and a girl who were in need of real help, and the kindness of a
> stranger in resolving a problem.

(Robert Tamashunas Letter, Ex. A-12.) Since that day, when Rob came to R███ rescue, their

two families have been close. However, as her father recounts, that was not the only time that

Rob came to R███ aid:

> Last year, I unfortunately had to be out of town one weekend in March to attend a
> non-profit board meeting. The board meeting fell on the same weekend as our
> daughters' school 'Dance with your Darling', which is our town's father-daughter
> dance. I was as heartbroken as my daughter that I had to miss the event.
> Knowing that I was to miss the event, Rob offered to take R███ to the dance with

his daughter B███.  I had other friends who were going to the dance with their daughters who knew I was missing the event, but Rob was the only one who stepped up and offered to take R███.  To make the night special for them, he took them out to dinner before the dance and made sure that R███ would have a fun night.  He also sent pictures to me throughout the evening.

This past year, I was able to attend the event so the four of us were able to go together and eat dinner at the same restaurant.  However, my presence this year wasn't the only thing that was different.  Another friend of Rob's was in a similar spot as I was last year.  He got called out of town and was unable to attend the event this year.  Rob once again stepped up and offered to take a 'dad-less' daughter to the dance- so this year there were five of us at dinner.  These small details reveal the value Rob places on his friendships and showed his empathy as a father.

(Robert Tamashunas Letter, Ex. A-12.)

Thoughtful gestures like these are why the people who know him speak so highly of him, as a "superhero in everyday clothes."  (Heather Morgan Letter, Ex. A-10.)  Whether helping a hurt child or helping others weather a natural disaster, Rob is there for those who need help in times of crisis.  In October 2012 when Superstorm Sandy devastated the region, flooding coastal areas and causing mass power outages, Rob provided refuge to family and friends.  In addition to sheltering most of his extended family, Rob sought to help those who could not make it to his home, like his in-laws, for example:

When Hurricane Sandy hit the Jersey Shore in 2012, I was in the hospital in New York with a medical condition and my husband was there with me.  Because the home that we live in is in a flood zone, residents were urged to evacuate and to move belongings out of the first floor.  Rob single handedly moved our furniture and personal belongings from the first floor to the second floor and prepared the home as best he could for the storm.  Unfortunately, the home sustained extensive damage and we had to move out for approximately one year while the storm damage was repaired and ultimately the home was raised.  Rob took charge of all of the repairs and insurance claims during this process and never once complained about it.

(Ingrid Schweiger & Joe Janisaitis Letter, Ex. A-5.)  Rob also provided refuge to his sister Erica and her family when their situation turned dire:

21

> The hurricane destroyed our house and the entire area lost power for many days. Not surprisingly, Rob was prepared to "weather the storm," with a substantial generator powering his home, which became a base for the rest of his family and several neighbors during the recovery. Rob, without hesitation, opened his doors to many. There were people sleeping in beds, on couches, on floors. Guests included his nearly 90 year old diabetic grandmother, his father who was still in post-surgical recovery, and a 3 year old neighborhood boy. There wasn't much to do, and there wasn't much to eat, but he and his family took us all in without thinking twice about it.

(Darpan Kapadia Letter, Ex. A-23.)

After ensuring the safety of his family, Rob's thoughts turned to the safety of his colleagues and members of his community, including the Saads, who

> lost power at our home for an extended period of time following Hurricane Sandy[.] Rob insisted that our family . . . stay with him and his family even though he had already accommodated his grandmother, his parents, his in-laws, and his sister's family; all while endeavoring to address the flood damage to his in-laws' house. He took all four of us in and treated us like we were a part of his family during a difficult time.

(Albert Saad Letter, Ex. A-26.) And a colleague and her family: "Knowing that we lived in an area [of Manhattan] without power he reached out to us immediately and arranged for a nearby hotel accommodation. This assistance I will never forget." (Bernardette Haken Letter, Ex. A-37 (describing Rob "as a kind person who always lent a helping hand").)

Rob's compassion during disaster is not limited to those known to him personally:

> Subsequent to the devastating earthquake in Haiti in 2008, Rob and his partners very quietly redoubled their efforts in that country to provide medical care to the local community. Despite innumerable conversations and days socializing together, Rob never mentioned it. When I did finally learn about the extent of their activities, I brought it up to him with expressions of respect and admiration. Slightly embarrassed by my comments, his response to me was stunning. He totally downplayed the effort as a philanthropic endeavor worthy of plaudits. Instead, he described the act as a categorical imperative, explaining that he (and his partners) had a moral obligation to act and that to ignore the plights of the victims when he himself had been so fortunate in his life was inconceivable. Hearing this, it was my turn to be embarrassed.

(Hans C. Vitzthum IV Letter, Ex. A-9.)

22

The crises we face are often times not the hundred year storms but the loneliness and despair that can follow the loss of a loved one, or the countless other issues we all struggle with in our daily lives.  Rob has been a steady source of emotional support for family and friends facing tough times:

- "When I lived in Chicago and my brother committed suicide, Rob flew from New York to come to the funeral.  When my father was diagnosed with ███ and I ran my first marathon to raise money for ███, Rob flew from New York to cheer me on.  When my dad finally succumbed to ███ Rob flew from New York to attend my dad's funeral.  As a friend, he does the hard work."  (John Peters Letter, Ex. A-7.)

- "Last year, my wife was very sick and hospitalized for several months.  Rob was always reaching out to see how she was doing and to emotionally support me through a terrifying time.  He was always extremely concerned and very caring.  That is how Rob has been his whole life.  Always looking out for others and wanting to be there for them."  (Craig Warner Letter, Ex. A-17.)

- "[W]hen a mutual friend's father passed away and I was unable to afford a plane ticket to attend the funeral, Rob bought a ticket for me and made me promise to accept it as a gift.  What makes Rob even more special is all the similar stories I've heard from other people, each with their own version of experiencing Rob's incredible support and generosity (all without being asked or any expectation of reciprocation).  It is a core component of his character."  (Zach Enterlin Letter, Ex. A-21.)

- "I have always known Rob to be an incredibly generous, compassionate, humble and caring man.  I lost my mother two years ago to cancer and Rob went out of his way to

reach out to me and ask me out for drinks to help me with the grieving process. Rob
had lost his dad a few months prior so he understood firsthand what I was dealing
with." (Brett Marcus Letter, Ex. A-13.)

- "Rob was an extreme source of comfort, with what seemed like an infinite amount of
time to listen and reflect, as I worked through my difficult divorce—trying to balance
a demanding job while raising two young boys. Since our kids were the same age,
he'd often encourage me to visit him and his family on a weekend.
It was on the first of these visits that I first got a glimpse of Rob's dedication to his
children and his family. It was instantly clear that his kids adored him and the feeling
was mutual. We had a terrific time playing soccer and baseball with J▇ and A▇
and laughing together around the house. It was a wonderfully calm and relaxed
afternoon that continued to strengthen my respect and admiration for Rob, this time as
a father and friend, instead of solely as an investor." (Brian Bizoza Letter, Ex. A-18.)

- "Two years ago when I was unemployed and at an emotional low point, one of my
first phone calls was to Rob. Not only was Rob a voice of reason, encouragement and
emotional support, but he was also the first to offer to make calls on my behalf and
see if there was any way that he could help. A true friend. He helped me through my
darkest and most depressing days." (Andrew Javorsky Letter, Ex. A-6.)

It is easy to see why Rob is described as "the guy you want to be friends with because
you know you can always depend on him." (Ingrid Schweiger & Joe Janisaitis Letter, Ex. A-5.)
Indeed, Jenn confesses that "over the years [she has] been blown away by his selflessness and
dedication to his family and friends." (Jenn Olan Letter, Ex. A-1.)

Rob's actions in support of others in their times of need is truly remarkable.  And yet even when Rob finds himself in times of desolation and despair, his focus remains on helping those around him.  In August 2012, Rob's father was diagnosed with ████████████████ ████████████████████████████ that his father battled until his passing in December 2014.  (Andrea Olan Letter, Ex. A-3; Marc J. Schweiger Letter, Ex. A-44.)

"Rob's greatest singular loss has been that of the passing of his father . . . ." (Eileen & Stuart Bohrer Letter, Ex. A-14.)  And yet despite all that Rob must have felt during the dark time that was "the last few years of his [father's] life, when his disease reappeared and progressed rapidly, Rob took charge of exploring all medical options, comforting his parents and siblings, accompanying his parents to doctors visits all the while attending to the needs of his wife and three children."  (Marc J. Schweiger Letter, Ex. A-44.)  "Rob became the chief advocate for his father," (Ingrid Schweiger & Joe Janisaitis Letter, Ex. A-5), "research[ing] treatment options," (Jenn Olan Letter, Ex. A-1) and attending "every doctor's appointment and surgical procedure, of which there were many."  (Jenn Olan Letter, Ex. A-1.)  It did not matter

> [w]hether an appointment was scheduled at 8am and he missed work or 6pm at the end of a long work week, Rob sat in the endless waiting rooms with my mom and dad, absorbing the information, translating back to them, and then making the rounds of phone calls to the extended family.  No one assigned this to Rob.  He did not raise his hand and say, "I got this."  He was just Rob- the one in our family who does not need fanfare or the pat on the back, but does what is right.

(Andrea Olan Letter, Ex. A-3.)

Looking past his own feelings, Rob was there to support his mother and sisters in their time of need:

> Rob was the person who called me and delivered the news that there was nothing left to do for our dad, that our dad was entering hospice.  Rob was the one I called when, beside my dad in his final days, my dad whispered to me that he wanted to die.  That it was time.  I knew Rob was the one who would steady me and just be there on the other side of the phone line to absorb the pain of the moment.  I have

always known Rob like this-- a quiet, steady, sensitive, morally grounded son and brother. For good or ill, Rob's candor has always been a prominent trait of his. In this situation dealing with our dad's prognosis, like many we've been in, Rob's candor and honesty was sometimes tough to hear but helped us to reconcile the reality of our father's life.

(Andrea Olan Letter, Ex. A-3.) "During the final months of his dad's life, he frequently slept at our home to comfort and support us. In the final days, Robert slept in the bed beside his father to make sure he was there if his dad needed." (Susan Olan Letter, Ex. A-2.)

Throughout the years his dad suffered with ███████████████, Rob was driven by a desire to extend not just the time, but the quality of his life. Steadfast in his pursuit of doctors, medications, alternative therapies, and protocols – Rob cared not just for his father's physical well being, but also for his emotional well being. Rob assured his father that along with his two sisters all family matters would be taken care of and that his mother would have no concerns beyond trying to heal and recover from such a profound loss. Through his own pain and anguish, Rob remained committed to maintaining the stability of his immediate family and sparing them undue stress.

(Eileen & Stuart Bohrer Letter, Ex. A-14.)

Rob "was instrumental in making important decisions in his father's course of treatment and was at his father's side as a devoted son until he passed away." (Phyllis & Howard Javorsky Letter, Ex. A-11.) "After his father passed away, despite his own grief, he was (and continues to be) an important source of support for his mother and his sisters." (Jenn Olan Letter, Ex. A-1.) His mother describes his attentiveness during this time as "invaluable," noting that Rob "provided emotional support and practical guidance to help [his mother] get settled in [her] new life." (Susan Olan Letter, Ex. A-2.) "Since his father's death, Rob has assumed the position of the head of the family and is always available to his mother and sisters and their families." (Ingrid Schweiger & Joe Janisaitis Letter, Ex. A-5.)

Even in his darkest hours, Rob shows grace and compassion few of us could ever find.

The head of VNA's hospice program that cared for Rob's father had this to say of Rob during

that time:

> In an incredibly difficult situation I saw Rob continuously step up on behalf of his father, mom and sisters to make sure that all the home hospice care needs of his family were met.  My nursing staff and I found him to be an incredibly respectful and conscientious person to work with-he helped his family understand and carry out the nurses care plan.  Having personally worked with hundreds of families receiving home hospice care as a hospice physician, I can confidently say that Rob was among the most caring, reliable, present, helpful and engaged family members of a home hospice patient that I have worked with.  Sadly, Rob's dad passed away in our hospice program, but he was able to spend his last days at home surrounded by family and with comfort and dignity in large part due to Rob.  Rob made it a point to recognize the hospice staff involved with his dad's care, he clearly understood the hard work of community health nurses and home health aides and felt a sense of care and concern for them.

(Steven Landers Letter, Ex. A-28.)

Even in the present circumstances, Rob's thoughts and actions have remained focused on

helping others.  For example:

> Since his arrest last May, Rob once again has shown that his focus is on others and not himself.  He has been more worried about me, about the kids, and about his mother and sisters than he has been about himself.  The ripple effects of his legal situation have been widespread, and as we all learn to live with the situation we find ourselves in, Rob's strength and courage have been remarkable.

(Jenn Olan Letter, Ex. A-1.)

> [W]hen the time came that Rob was on leave prior to this trial, he remained just the same.  He continued to quietly donate to the Deerfield Foundation which funds children's healthcare delivery in New York City and several countries in Africa.  Despite not knowing whether he would ever have a job again, his abiding commitment to helping children attain the best medical care remained.  And he did so quietly.  This move wasn't publicized.  It wasn't a ploy for sympathy.  It was simply a given.  It was so interwoven with his character that no external upset in his life would derail it.  It is an example of the Rob I want you to see.

(Howard Furst Letter, Ex. A-15.)

## II.      ROB OLAN AND THE OFFENSE CONDUCT[2]

Mr. Olan accepts that he has been convicted and the Court must sentence him.  We do not here argue guilt or innocence.  But we do address the scope of the offense conduct to address Mr. Olan's role in the offense.

Despite some broad allegations at trial, the scope of proof regarding Rob Olan was narrow, encompassing only one trade in which Mr. Olan was not the driving force.  When the Court reviews the evidence regarding the offense conduct, it will conclude that the conduct would have occurred even had Mr. Olan been entirely absent from the discussion—he was in no sense integral to the conduct, though we readily acknowledge that he agreed with the 2012 radiation oncology trade, on the grounds and in the manner set out below.

### A.      Background

As the Court will recall, Deerfield's focus on healthcare investing was divided into four sectors, each of which was covered by a team of three research analysts.  The medical devices sector group ("Devices") was comprised of Messrs. Olan, Huber, and Fogel from 2006 until 2013, when Mr. Fogel transferred to Deerfield's medical services sector group ("Services").  As Devices analysts, they researched publicly-traded companies that manufactured medical devices and they made investment recommendations to Deerfield's portfolio manager, Jim Flynn, who was solely responsible for all investment decisions.  (Tr. at 751:23–25 (Fogel); 2310:4–13 (Clark).)  Investment recommendations did not need to be unanimous.  (Tr. at 673:17–21 (Fogel).)  In fact, the purpose for having three analysts to a team was "to see where they agree and where they disagree and to try to understand how reliable or unreliable our thoughts about a

---

[2]  The description of the offense conduct is derived from the testimony and exhibits admitted at trial.

given area are." (Tr. at 2964:23–2965:6 (Flynn).) Consensus was required only for large positions. (Tr. at 673:17–21 (Fogel).)

### B.   The 2012 Radiation Oncology Trade

The record regarding the 2012 radiation oncology trade shows that the trade was not Rob Olan's idea, he was skeptical of Blaszczak's information until it was corroborated by other sources, and the offense conduct could have occurred without his participation. Put simply, Rob Olan was not a driver of the conduct for which he has been convicted.

The 2012 radiation oncology trade started with a contact from Mr. Blaszczak on May 9. Mr. Blaszczak called Mr. Fogel's cell phone and apparently relayed his belief that CMS would propose "25-30% or larger cuts" to certain radiation oncology treatments stemming from reductions to their treatment times adopted by CMS. (GX 806.) Mr. Fogel, who was out of the office, then relayed that information to the eighteen people on the Devices listserv, one of whom was Mr. Olan. (GX 806.) Mr. Olan learned of Mr. Blaszczak's prediction only second-hand.

Mr. Olan was traveling the next day, May 10, 2012. At 11:48 AM, Mr. Huber emailed Mr. Olan, writing that both he and Mr. Fogel (copied on the email) wanted to recommend to Deerfield certain stock trades, including a short sale of Varian Medical Systems, a company that manufactures radiation oncology devices. (GX 810.) Ten minutes later, at 11:58 AM, Mr. Fogel and Mr. Huber recommended the radiation oncology trade to the decision-makers at Deerfield without waiting for input from Mr. Olan. (GX 809.) By the time that Mr. Olan replied to his colleagues back in the office, (GX 810 ("Fine on all of this")), they had already made the recommendations to Mr. Flynn. (GX 810 (Fogel: "U don't get a vote b/c you're out today.").)

On May 16, 2012, Mr. Olan, back in the office, began to express skepticism about whether CMS would propose the kind of cuts to radiation oncology reimbursement that Mr.

29

Blaszczak had predicted.  Over the course of the next month, Mr. Olan frequently expressed skepticism about Mr. Blaszczak's prediction.  For example:

- On May 16, 2012, Mr. Olan and Mr. Huber exchanged a number of emails debating how to evaluate Mr. Blaszczak's "bias on Rad[iation] Onc[ology] reimb[ursement]." (GX 811.)  During the debate, Mr. Olan proclaimed "we don't know what CMS is going to do."  (GX 811.)

- On May 25, 2012, Mr. Olan again voiced skepticism about whether Mr. Blaszczak's radiation oncology prediction would come true.  (GX 816.)  After speaking with political intelligence analyst Eric Assaraf, Mr. Olan wrote to Messrs. Huber and Fogel:  "Eric's comments, informed or not, make[] me wonder whether we'll see rad onc cuts this y[ea]r.  [T]hat could set off a political firestorm."  (GX 816.)  In response, Mr. Fogel discounted Mr. Olan's comment and suggested that the three Devices analysts create "scenario[s]" that assign probabilities to different potential outcomes for CMS's proposed radiation oncology rule.  (GX 816.)

- Later that day, Mr. Olan created such a scenario that assigned a 60% chance that CMS would propose "no cut" to the radiation oncology reimbursement rate and a 25% chance that CMS would propose a 10% cut.  (DX 5421.)  In total, Mr. Olan assigned an 85% chance that CMS would propose no cuts or cuts that were significantly less than the 25-30% cuts that Mr. Blaszczak had predicted.  (DX 5421.) Mr. Olan's scenario also predicted that Varian's stock would increase in price by 1%, meaning that a short of Varian stock, such as the trades executed by Deerfield between May and July 2012, would lose Deerfield money.  (DX 5421.)

- On May 30, 2012, Mr. Olan recommended covering the Varian short because he was "dubious about the end result," that is, about whether CMS would propose the kind of cuts to radiation oncology reimbursement that Mr. Blaszczak had predicted.  (DX 1071.)  That same day, Deerfield entered an order to cover 90,000 shares of Varian stock.  (GX 204.)

- On June 7, 2012, the Devices analysts created revised scenarios.  As described by Mr. Fogel, Mr. Olan's scenario assigned "75% odds of no proposed cut or [a] 10% cut proposed.  That's just not what our inputs point to, so I believe he is just plainly misinformed and misguided." (DX 1614.)  Mr. Olan's scenarios reflected his view that there was a 75% chance that Mr. Blaszczak's prediction would be proven wrong and a 25% chance that his prediction would be proven right.  (DX 1614.)  Mr. Fogel's scenarios, by contrast, reflected his view that there was a 65% chance that his prediction would be proven right and a 35% chance that Mr. Blaszczak's prediction would be proven wrong.  (DX 1614.)  Notwithstanding Mr. Olan's views, on June 7, 2012 Deerfield shorted 105,000 shares of Varian stock, and entered orders to short 833,000 shares of Accuray stock and 118,000 shares of Elekta stock.

A week later, political intelligence consultant Ipsita Smolinski predicted that CMS would propose radiation oncology reimbursement cuts that were nearly identical to those predicted by Mr. Blaszczak.  (GX 834 & DX 1610.)  On June 14, 2012, Mr. Fogel emailed Devices a summary of a call he had with Ms. Smolinski, writing "CMS strongly considering reducing # of minutes assoc w IMRT…   Assumption of 60 minutes…really more like 20-30 minutes… 30-40% cut to the code. . . ." (GX 834.)  There was no evidence at trial that Ms. Smolinski obtained this information improperly.  Indeed, Mr. Fogel testified that he was "not sure" whether Ms.

Smolinski told him even that her information came from CMS, much less that it was obtained from CMS improperly, (Tr. at 1217:12–24 (Fogel)), despite allegations in the indictment that Ms. Smolinski was a co-conspirator.  With this additional and legitimate information in hand, Mr. Olan agreed to increase the fund's short position.  (GX 834.)

*     *     *

In sum, the record makes clear that the 2012 radiation oncology trade was not Mr. Olan's idea, he did not have direct contact with Mr. Blaszczak about the radiation oncology information, he was profoundly skeptical about Mr. Blaszczak's prediction, and that he warmed to the trade idea over time as other, clearly legitimate, inputs supported Mr. Blaszczak's prediction.

More broadly, Mr. Olan was known as a Blaszczak skeptic, (Tr. 2999:12–3000:5 (Flynn); Tr. 2996:8-20 (Flynn)), and was never the principal contact with Mr. Blaszczak, (Tr. at 679:21–22 (Fogel)), although to be sure he had contact with Mr. Blaszczak and valued his inputs as one piece among many.

### C.     The 2009 Radiation Oncology Trade

Although the verdict offers no guidance as to whether the jury viewed Deerfield's 2009 radiation oncology trade as lawful or unlawful, the evidence at trial showed the trading was based on public information.

The government alleged that in 2009 Mr. Blaszczak provided confidential CMS information to the Devices analysts about upcoming proposed cuts to radiation oncology reimbursement.  The mechanism for these cuts was a change in the number of hours that CMS assumed radiation oncology devices were used per week, often referred to as the "utilization rate" of the device.

Public discussion of a potential increase to the utilization rate assumption for radiation oncology devices began as early as March 2009, when the Medicare Payment Advisory Commission[3] ("MedPAC") recommended that Congress direct CMS to increase the rate at which they assume expensive imaging machines are being used from 50% or 25 hours per week to 90% or 45 hours per week.  (DX 2493-17, DX 2493-18 & DX 2493-54.)  MedPAC found reason to believe that certain expensive medical devices used for diagnostic imaging were "used much more frequently than Medicare assumes."  (DX 2493-17.)  It was "fairly common knowledge" that "[i]n 2007 CMS had bundled radiation oncology equipment with . . . medical imaging," (Tr. at 3152:22–3153:5 (Husain)), and so any change affecting imaging devices also would apply to radiation oncology devices.  The proposed change sought to "discourage providers from purchasing expensive imaging equipment unless they had sufficient volume to justify the purchase."  (DX 2493-18.)

On Saturday, June 13, 2009, President Obama announced over $313 billion in proposed cuts by CMS aimed at "reducing Medicare overpayments to private insurers, and rooting out waste in Medicare and Medicaid."  (DX 5586.)  At the same time, the White House released to the public a "Medicare Fact Sheet" that provided details on the proposed cost savings.  (DX 5585.)  Included on the Medicare Fact Sheet was an indication that CMS would "[a]djust

---

[3]   "The Medicare Payment Advisory Commission (MedPAC) is an independent congressional agency established by the Balanced Budget Act of 1997 (P.L. 105-33) to advise the U.S. Congress on issues affecting the Medicare program. . . .  MedPAC meets publicly to discuss policy issues and formulate its recommendations to the Congress.  In the course of these meetings, Commissioners consider the results of staff research, presentations by policy experts, and comments from interested parties. (Meeting transcripts are available at www.medpac.gov.) Commission members and staff also seek input on Medicare issues through frequent meetings with individuals interested in the program, including staff from congressional committees and the Centers for Medicare & Medicaid Services (CMS), health care researchers, health care providers, and beneficiary advocates.

Two reports—issued in March and June each year—are the primary outlets for Commission recommendations. In addition to annual reports and occasional reports on subjects requested by the Congress, MedPAC advises the Congress through other avenues, including comments on reports and proposed regulations issued by the Secretary of the Department of Health and Human Services, testimony, and briefings for congressional staff." (DX 2493-2.)

payment rates for physician imaging services to better reflect actual usage." (DX 5585.) The White House then specified that the utilization rates for diagnostic imaging services would be changed from 50% to 95%, "which is closely aligned with a Medicare Payment Advisory Commission (MedPAC) recommendation." (DX 5585.)

Deerfield did not short Varian stock until June 18, 2009, five days after President Obama's announcement. (*See* GX 201 & GX 202.) While the government offered some evidence that Deerfield analysts spoke with Mr. Blaszczak prior to the June 18, 2009 trade, (a) Mr. Fogel did not testify that Mr. Blaszczak told them that the information was improperly obtained from CMS, and (b) in any event the information was public before any trading on the 18th.

Indeed, at least two other political intelligence consultants predicted CMS reimbursement rate cuts based on the utilization rate information. For example, on June 22, 2009, after around two weeks of research, Junaid Husain of Soleil published a report predicting that CMS would propose cuts as great as 25% to radiation oncology reimbursement due to the increased utilization rate assumptions. (DX 2491 & DX 2601; Tr. at 3154:16–19 (Husain).) Specifically, Mr. Husain attributed his predicted cuts "to language in the Senate/House healthcare reform bills, which include provisions for changing the medical equipment utilization rate from 50% to as high as 95%." (DX 2601.) He further predicted that, even absent legislatively promulgated cuts, "there [wa]s enough political and practical will amongst Congress and CMS administrators to rein in medical imaging reimbursement (and correspondingly, radiation oncology reimbursement as well)." (DX 2601.)

Later that day, Mr. Fogel forwarded Mr. Husain's note to political intelligence consultant Ipsita Smolinski and asked for her thoughts on the likelihood of proposed radiation oncology

reimbursement cuts based on the increased utilization rate assumption.  (DX 2491.)  Ms. Smolinski replied, "I'd almost call it a done deal [J]ordan b/c the Administration included the U[tilization]R[ate] increase assumption in its announcement to cut an additional 313 bn on [F]ri[day] [J]une 12."  (DX 2491.)

Accordingly, the evidence at trial established that the likelihood of a substantial cut to radiation oncology reimbursement was public before the first of Deerfield's trades in Varian on June 18, 2009.  As a result, the Court should not find that Mr. Olan was involved in any improper trading with respect to the 2009 radiation oncology allegations.  The jury verdict does not compel a contrary finding, and the record belies it.

### D.    The 2013 Dialysis Trades

In January 2013, Mr. Fogel transferred to Services from Devices.  While in Services, Mr. Fogel continued to trade on information provided by Mr. Blaszczak.  However, Mr. Olan, still in Devices, is not alleged to have participated in any unlawful trading after Mr. Fogel's transfer. Specifically, Mr. Olan is not alleged to have recommended or otherwise participated in either of the Dialysis trades executed in 2013.

### 1.    The 2013 Proposed Dialysis Rule

On June 13, 2013, Mr. Blaszczak published a research note predicting that CMS would propose 10-12% cuts to the reimbursement rate of dialysis services.  (GX 1738.)  Five days later, Mr. Blaszczak emailed Mr. Fogel, indicating that CMS would propose "12% [cuts] but phased in over 3 years 50/25/25."  (GX 878.)  Mr. Fogel then forwarded his exchange with Mr. Blaszczak to the two other Services analysts, both of whom expressed interest in recommending that Deerfield trade on the basis of Mr. Blaszczak's prediction.  (GX 879.)  On June 25, Mr. Fogel asked Mr. Blaszczak whether his prediction had changed.  (GX 880.)  Later that day, Mr. Fogel

emailed the Deerfield decisionmakers to recommend shorting dialysis services stocks.  (GX 883.)  Mr. Olan was copied on none of these emails.

Mr. Olan had no involvement in the discussions about this dialysis trade.  The decision to recommend the trade was made by the three Services analysts, Mr. Olan was not consulted, and there is no evidence even that he knew the basis for the Services group's trading recommendation.

### 2.    The 2013 Final ESRD Rule

Likewise, the government's evidence at trial demonstrated that Mr. Olan was not involved in the November 2013 dialysis services trades.  On November 15, 2013, Mr. Fogel asked Mr. Blaszczak about his expectations for the upcoming dialysis and home health rules.  (GX 935.)  Mr. Blaszczak informed Mr. Fogel that he expected the final ESRD rule to maintain the full 12% cut but phase it in over four years.  (GX 935.)  Mr. Fogel forwarded Mr. Blaszczak's predictions to his Services colleagues contemplating a trade recommendation.  (GX 935.)

Mr. Olan was not copied on any of the emails regarding the dialysis final rule trade in 2013, and there is no evidence that he knew the basis of the Services group's recommendation.  Mr. Olan had nothing to do with this trade.

### E.    2013 Home Health Trade – Visium

The government has not alleged that Mr. Olan conspired with Plaford or any other Visium employee.  Mr. Olan had nothing to do with this trade.

## III.    THE ADVISORY SENTENCING GUIDELINES

### A.     Base Offense Level

The conduct at issue in this case is plainly insider trading.  Accordingly, the applicable Guideline is § 2B1.4.  *See* U.S.S.G. § 2B1.1(c)(3) (certain fraud-based offenses are redirected to other sections of Chapter Two that "specifically cover[]" the conduct that establishes the offense of conviction).  The counts of conviction (two counts of conspiracy, one count of theft of government property, one count of wire fraud, and one count of Title 18 securities fraud) are grouped together for sentencing purposes.  *See* U.S.S.G. § 3D1.2.

Therefore, the base offense level is eight.  U.S.S.G. §§ 2B1.4 & 2B1.1(c)(3).

### B.     Gain calculation

Under § 2B1.4, the offense level is adjusted based on "the gain resulting from the offense."  U.S.S.G. § 2B1.4(a).

Here, the allegations at trial encompassed five trades, though the verdict does not shed light on the jury's view of each:  (1) a 2009 radiation oncology trade (Devices); (2) a 2012 radiation oncology trade (Devices); (3) a June/July 2013 dialysis trade (Services); (4) a November 2013 dialysis trade (Services); and (5) a 2013 home health trade (Visium).  The government never alleged that Mr. Olan played a role in the two 2013 Services trades, or any Visium trades, and there was no evidence that Mr. Olan had anything to do with those trades.  *See* Sentencing Tr. at 6:14–9:10, *United States v. Emanuel Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. Oct. 7, 2011), Ex. D (declining to include gain from trades where defendant was not included in communications about the improper information and its source).  And, as addressed

in Part II.D above, the 2009 trade was based on publicly available information.[4]  Accordingly,

the gain at issue for the Court is solely that connected with the 2012 radiation oncology trade.

The government miscalculates Deerfield's gain from the 2012 radiation oncology trade to

be $2,733,114, (GX 3000), overstating Mr. Olan's culpability.  Gain is defined by § 2B1.4 as

"the total increase in value realized through trading in securities by the defendant and persons

acting in concert with the defendant or to whom the defendant provided inside information."

U.S.S.G. § 2B1.4 cmt. background.  It cannot be said that Deerfield investors were "persons

acting in concert with" Mr. Olan or any alleged co-conspirator, nor that Deerfield investors

received inside information from Mr. Olan or any alleged co-conspirator.  Like many hedge

funds, Deerfield receives annual management fees of 2% of all assets under management and

20% of all trading profits.  (Tr. at 3179:18–3180:21 (Isler).)  Deerfield's investors receive the

remaining 80% of trading profits.  The plain language of § 2B1.4's commentary defines "gain"

to exclude any "value realized" by Deerfield investors where, as here, they were not acting in

concert with Mr. Olan.  Judge Holwell found that this phrase was "not a model of clarity," in

*United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH), 2012 WL 362031, at *39–43 (S.D.N.Y.

Jan. 31, 2012), and found that "gain" should be read to include gain by non-culpable persons not

acting in concert with the defendant.  *See also United States v. Martoma*, 48 F. Supp. 3d 555,

563–66 (S.D.N.Y. 2014); *United States v. Gupta*, 904 F. Supp. 2d 349, 352–53 (S.D.N.Y. 2012).

We respectfully disagree with this reasoning.  Focusing on the commentary to § 2B1.4 that

defines "gain" to be "the total increase in value realized through trading in securities by the

---

[4]  Congress passed the STOCK Act in April 2012 because it believed it needed to clarify that trading on government information could be unlawful.  S. REP. No. 112-244 (2012) ("The Committee then considered an amendment offered by Senator Paul aimed at making clear that insider trading laws cover all federal employees.").  To the extent the Court is not convinced that the utilization rate changes that drove the radiation oncology reimbursement rate changes were public at the time of the June 18, 2009 Varian trades, it should nevertheless not include any gain from those 2009 trades because they happened three years before Congress clarified that trading on government information could be the basis for insider trading.

defendant and persons acting in concert with the defendant," Judge Holwell construed "by the

defendant" to modify "trading in securities" but not "value realized." But § 2B1.4 explicitly uses

only gain and not loss as the basis for increasing a sentence. "Gain" is appropriately a measure

of culpability only regarding the benefit to culpable persons (a defendant and his coconspirators).

Aggregating loss may make sense as a measure of harm caused by an offense; aggregating gain

to non-culpable persons does not make sense because the "gain" is to persons who are unaware

of the conduct. Therefore, the most sensible reading of the text is that "by the defendant"

modifies both "value realized" and "through trading in securities." This reading of "gain" is

consistent with the Second Circuit's decision in *United States v. Contorinis*, 692 F.3d at 136 (2d

Cir. 2012), in which the court found that profits received by third parties as a result of criminal

conduct were not subject to forfeiture where those funds were "never possessed or controlled by

[the defendant] or others acting in concert with him." *Id.* at 147. Thus, the penalty of criminal

forfeiture is measured only by gain to the defendant and his coconspirators, and not gain to third

parties, and here the gain measure used to calculate the Guidelines range should follow the same

principle. Especially where the language of the Guideline commentary so readily allows for the

reading set forth above, gain for purposes of the Guidelines calculation should not include gain

to Deerfield investors. The gain should be no greater than 20% of the government's figure—

$546,623.[5]

### C.    Mr. Olan Played a Minor Role in the Offense

Mr. Olan's minor role in the offense warrants a two-point reduction of his offense level

under U.S.S.G. § 3B1.2. As the Court knows, the Sentencing Commission in 2015 found that

District Courts were applying the § 3B1.2 role reduction "inconsistently and more sparingly than

---

[5]   The Presentence Investigation Report ("PSR") concluded that the gain from the offense is $7,142,756. (PSR ¶ 110.) Mr. Olan objects to this figure.

the Commission intended," and to remedy that situation the Commission established factors to guide application of the role adjustments.  U.S.S.G. App. C, amend. 794 (amending U.S.S.G. § 3B1.2 cmt. n.3(C)).  These factors include:  (1) "the degree to which the defendant understood the scope and structure of the criminal activity"; (2) "the degree to which the defendant participated in planning or organizing the criminal activity"; (3) "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority"; (4) "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts"; and (5) "the degree to which the defendant stood to benefit from the criminal activity."  U.S.S.G. § 3B1.2 cmt. n.3(c).

### 1.    Mr. Olan's Understanding of the Scope and Structure of the Offense Conduct

First, Mr. Olan did not know the full scope or structure of the charged conspiracy.  The allegations at trial regarding Deerfield encompassed four trades, though the verdict does not shed light on the jury's view of each:  (1) a 2009 radiation oncology trade (Devices); (2) a 2012 radiation oncology trade (Devices); (3) a June/July 2013 dialysis trade (Services); and (4) a November 2013 dialysis trade (Services).  The government never alleged that Mr. Olan played a role in the two 2013 Services trades, and there was no evidence that Mr. Olan had anything to do with those trades.  They happened away from him, after Mr. Fogel left Devices and without his participation.

Second, of the Devices analysts, Mr. Olan was furthest removed from the source of the information.  He communicated with Mr. Blaszczak the least, (Tr. at 679:21–22 (Fogel)), often learning of Mr. Blaszczak's predictions second-hand, if at all.  (*See, e.g.*, GX 806; GX 813; GX 815; GX 819; GX 832; GX 850)  Further, there is no evidence that Mr. Olan interacted with Mr.

Worrall or anyone else at CMS, or was involved in inducing them to breach their fiduciary duties.

### 2.     Mr. Olan Did Not Plan or Organize the Criminal Activity

Mr. Olan did not orchestrate the conduct.  He was skeptical of Mr. Blaszczak in general, skeptical of him regarding his 2012 radiation oncology views, and warmed to the trade only after other, indisputably legitimate sources had reinforced Mr. Blaszczak's views.

Mr. Olan was "typically skeptical" of Mr. Blaszczak and his predictions and "tended to be more skeptical about [him]" than others at Deerfield.  (Tr. at 2999:12–3000:5 (Flynn); Tr. at 2996:8–20 (Flynn).)  Of the Devices analysts, Mr. Olan was the least likely to affirmatively seek out Mr. Blaszczak's views or to credit them when received.  (Tr. at 679:21–22 (Fogel).)  More generally, Mr. Olan believed that predictions about what the government would do were "reliably unreliable."  (DX 2597, Ex. B.)

Regarding the 2012 radiation oncology trade, the evidence was clear that Mr. Olan expressed skepticism about Mr. Blaszczak's prediction that CMS would propose large cuts to radiation oncology reimbursement.  (*See, e.g.*, GX 811; GX 816; DX 5421; DX 1071; DX 1614; DX 5629.)  In fact, on May 25, 2012, Mr. Olan entered a scenario in Deerfield's trade prediction system in which he calculated that a trade on Mr. Blaszczak's information would lose Deerfield's investors money.  (DX 5421.)  These scenarios were used to share the analysts' views with the decision-makers at Deerfield.  (Tr. at 757:25–758:4; 1211:3–6 (Fogel).)  On June 7, 2012, when Deerfield placed large orders to short the stocks of three radiation oncology device manufactures Varian, Elekta, and Accuray, Mr. Olan reiterated his view that CMS would not propose the cuts Mr. Blaszczak had predicted.  (DX 1614.)  That same day, Mr. Fogel made clear that they had decided to go ahead with the trade in spite of Mr. Olan: "Rob has 75% odds

of no proposed cut or a 10% cut proposed.  That's just not what our inputs point to, so I believe

he [Mr. Olan] is just plainly misinformed and misguided."  (DX 1614.)  Clearly, Mr. Olan was

not an instigator of these trades.

### 3.       Mr. Olan Did Not Exercise Decision-Making Authority or Influence Those Who Did

Mr. Olan exercised no decision-making authority over the relevant trading, and possessed

no discretion to execute trades at Deerfield during the relevant time.  (Tr. at 751:23–25 (Fogel);

2310:4–13 (Clark).)  Nor did he lobby others to pursue the trades at issue at trial.  Indeed, Mr.

Olan's initial recommendation in May 2012 was that the trade would lose money for Deerfield's

investors.  (DX 5421.)

### 4.       The Extent of Mr. Olan's Participation in the Offense Conduct

As late as June 7, 2012—the date Deerfield entered sizeable orders to short radiation

oncology stocks—Mr. Olan was mocked by Mr. Fogel for his antipathy toward the trade.  (DX

1614 ("Rob has 75% odds of no proposed cut or a 10% cut proposed.  That's just not what our

inputs point to, so I believe he [Mr. Olan] is just plainly misinformed and misguided.").)  A week

later, Mr. Olan's evolving view followed not more detailed predictions by Mr. Blaszczak, but

Mr. Fogel's recounting of a near identical prediction from Ispita Smolinski.  (*See* GX 834.)  And

none of the emails recommending the trades originated from Mr. Olan.  (*See, e.g.*, GX 810; GX

821; GX 832; GX 834; GX 850; GX 851.)

### 5.       Incentive to Commit the Offense

Finally, while it is true that Mr. Olan received a small percentage of Deerfield's trading

profits, whether Devices was more or less successful in a given year did not affect Mr. Olan's

carry percentage or his bonus.  (Tr. at 2974:23–2975:14 (Flynn) (Mr. Olan not compensated

based on performance of stock) & Tr. at 2972:1–25 (Flynn) (at beginning of year, partners

42

receive carried interest percentages they will earn for the year).)  And given that Mr. Olan received 1.35% of Deerfield's profits on any particular trade, (*see* Tr. at 3179:5–17 (Isler) & DX 901 & 903), Mr. Olan's share of the profits from the 2012 radiation oncology trade ($37,170) equaled 0.3% of his total compensation that year.  (DX 903.)  Mr. Olan had no financial incentive to commit the offense. To the contrary, he had no reason to risk his comfortable position at the firm for an additional $37,000.

Indeed, Mr. Olan's consistently skeptical voice underscores the degree to which he was not incentivized to cut corners.  (*See, e.g.*, DX 1071 (in May 2012 he was "dubious" about whether CMS would propose the kind of cuts to radiation oncology reimbursement that Mr. Blaszczak had predicted); GX 811 ("[W]e don't know what CMS is going to do."); GX 816 ("Eric's comments, informed or not, make[] me wonder whether we'll see rad onc cuts this y[ea]r.  [T]hat could set off a political firestorm."); DX 5421 (Mr. Olan's May 25, 2012 scenario assigning 85% chance that CMS's proposal would differ from Mr. Blaszczak's prediction and that a Varian short would lose Deerfield money); DX 1614 ("Rob has 75% odds of no proposed cut or a 10% cut proposed.  That's just not what our inputs point to, so I believe he is just plainly misinformed and misguided.").)

*     *     *

Taken together, the factors described above establish that Mr. Olan's role in the offense was minor:  even on the Government's evidence he knew of only a small part of the charged conduct; he initiated none of what occurred; he made no decisions and was openly skeptical of the prediction from Blaszczak in 2012; he warmed to the trade in light of predictions beyond Blaszczak's; and he had no incentive to act wrongly given the relatively tiny gain to him

personally, and given his otherwise comfortable position at the firm.  Accordingly, Mr. Olan's

conduct warrants a role reduction of two points.

### D.    The Advisory Guidelines Calculation

We believe that the appropriate Guidelines calculation is as follows:

| | |
|---|---|
| U.S.S.G. § 2B1.4 (insider trading) | 8 |
| U.S.S.G. § 2B1.1(b)(1)(I) ($250,000 < gain < $550,000) | +12 |
| U.S.S.G. § 3B1.2(b) (Minor Participant) | –2 |
| U.S.S.G. § 3B1.3 (Special Skill) | +2 |
| **Total Offense Level:** | **20**[6] |

Because Mr. Olan has no prior criminal history, Criminal History Category I applies.  Under the

Sentencing Table, an offense level of 20 corresponds to an advisory range of 33 to 41 months.

U.S.S.G. ch. 5, pt. A.  Considering the § 3553(a) factors, however, a sentence in this range would

be far greater than necessary to accomplish the goals of sentencing.

### IV.    THE FACTORS IN 18 U.S.C. § 3553(a) COUNSEL IN FAVOR OF A SENTENCE FAR BELOW THE ADVISORY GUIDELINES

In sentencing Rob Olan, the Court will pass judgment on not only a hedge fund analyst

convicted of insider trading but an exemplary human being universally admired for the strength

of his character and the depth of his generosity.  The Supreme Court has recognized "the

principle that the punishment should fit the offender and not merely the crime."  *Pepper v.

United States*, 562 U.S. 476, 487–88, 131 S.Ct. 1229, 1240 (2011) (internal quotation marks

---

[6]  Alternatively, should the Court find that the gain for purposes of § 2B1.4 includes the 80% earned by Deerfield investors, the gain would be as follows:

| | |
|---|---|
| U.S.S.G. § 2B1.4 (insider trading) | 8 |
| U.S.S.G. § 2B1.1(b)(1)(I) ($1,500,000 < gain < $3,500,000) | +16 |
| U.S.S.G. § 3B1.2(b) (Minor Participant) | –2 |
| U.S.S.G. § 3B1.3 (Special Skill) | +2 |
| Total Offense Level: | 24 |

An offense level of 24 corresponds to an advisory range of 51 to 63 months.  U.S.S.G. § ch.5, pt. A.

omitted).  "Consistent with this principle, [the Supreme Court] ha[s] observed that both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law."  *Id.* at 488, 131 S.Ct. at 1240.

As the Court knows well, a sentencing court calculates the applicable Guidelines range "only as a starting point."  *United States v. Preacely*, 628 F.3d 72, 84 (2d Cir. 2010) (Lynch, J., concurring).  The Court must then consider the factors set forth in 18 U.S.C. § 3553(a) to craft a sentence "sufficient, but not greater than necessary" to accomplish the purposes of sentencing.  18 U.S.C. § 3553(a).  In doing so, the sentencing judge has wide discretion to vary from the advisory Guidelines range, "perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless."  *Rita v. United States*, 551 U.S. 338, 351, 127 S. Ct. 2456, 2465 (2007).

Applying those "§ 3553(a) considerations"[7] to Rob Olan and the facts that brought him before the Court, only a sentence significantly below the advisory Guidelines range will be "not

---

[7]  In particular, the Section 3553(a) factors addressed here include: (1) the nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1); (2) the history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1); (3) the retributive, deterrent, and rehabilitative goals of sentencing, 18 U.S.C. § 3553(a)(2); and (4) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6).

In applying the Section 3553(a) factors, courts in this District have imposed below Guidelines sentences on every insider trading defendant convicted at trial in the last ten years.  *See, e.g.*, Sentencing Tr. at 18:18–20; 72:5–10, *United States v. Afriyie*, No. 16 Cr. 377 (PAE) (S.D.N.Y. July 26, 2017), ECF No. 151, Ex. L (imposing sentence of 45 months on Guidelines range of 78 to 97 months); Sentencing Tr. at 13:17–20; 32:17–21, *United States v. Walters*, No. 16 Cr. 338 (PKC) (S.D.N.Y. July 27, 2017), ECF No. 206, Ex. G (imposing 60 month sentence on Guidelines range of 97 to 121 months); Sentencing Tr. at 13:8–10; 41:21–24, *United States v. Sean Stewart*, No. 15 Cr. 287 (LTS) (S.D.N.Y. Mar. 17, 2017) (imposing 36 month sentence on Guidelines range of 63 to 78 months); Sentencing Tr. at 18:1–2; 49:11–13, *United States v. Riley*, No. 13 Cr. 339 (VEC) (S.D.N.Y. Apr. 27, 2015), ECF No. 263, Ex. I (imposing sentence of 78 months from Guidelines range of 121 to 151 months); Sentencing Transcript at 11:10–13; 45:4–8, *United States v. Martoma*, No. 12 Cr. 973 (PGG) (S.D.N.Y. Sept. 8, 2014), ECF No. 318, Ex. T (imposing 108 month sentence on Guidelines range of 188 to 235 months); Sentencing Tr. at 15:17–19; 60:1–3, *United States v. Chiasson*, No. 12 Cr. 121 (RJS), Ex. F (S.D.N.Y. May 13, 2013) (78

greater than necessary" to accomplish the stated purposes of sentencing. Significantly, the Probation Department has recognized that a non-Guidelines sentence is appropriate here. (PSR at 33–34) (recommending a 48-month sentence).)

We urge the Court to impose a non-Guideline sentence based on the following factors: (1) the nature and circumstances of the offense, including (a) Mr. Olan's limited role, and (b) the novel fact that Mr. Olan is to be sentenced for insider trading while having been acquitted of every Title 15 insider trading violation charged; (2) Mr. Olan's lifelong record of selflessness and generosity; (3) the fact that the Guidelines' gain calculation systematically overstates the seriousness of the offense and the culpability of Mr. Olan; (4) the lack of any need for specific deterrence, and the limited general deterrent value of a long sentence in this case; and (5) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6).

---

month sentence imposed on Guidelines range of 97 to 121 months); Sentencing Tr. 8:5–7; 59:1–3, *United States v. Newman*, No. 12 Cr. 121 (RJS) (S.D.N.Y. May 2, 2013), Ex. U (imposing 54 month sentence on Guidelines range of 63 to 78 months); Sentencing Tr. at 6:18–19; 29:17–20, *United States v. Whitman*, No. 12 Cr. 125 (JSR) (S.D.N.Y. Jan. 24, 2013), Ex. J (imposing 24 month sentence where Guidelines range was 51 to 63 months); *United States v. Gupta,* 904 F. Supp. 2d 349, 353–55 (S.D.N.Y. 2012) (imposing 24 month sentence on Guidelines range of 78 to 97 months); Sentencing Tr. at 27:5–7; 40:23–41:1, *United States v. Fleishman*, No. 11 Cr. 32 (JSR) (S.D.N.Y. Dec. 21, 2011), Ex. O (imposing 30 month sentence on Guidelines range of 37 to 46 months); Sentencing Tr. at 12:5–6; 46:19–22, *United States v. Zvi Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. Sept. 21, 2011), Ex. V (imposing 120 month sentence on Guidelines range of 121 to 151 months); Sentencing Tr. at 37:23–38:2; 68:17–20, *United States v. Jiau*, No. 11 Cr. 161 (JSR) (S.D.N.Y. Sept. 21, 2011), Ex. K (imposing 48 month sentence on Guidelines range of 78 to 97 months); Sentencing Tr. at 27:21–23; 28:8–11, *United States v. Rajaratnam*, No. 09 Cr. 1184 (RJH) (Oct. 13, 2011), Ex. P (imposing 132 month sentence on Guidelines range of 235 to 293 months); Sentencing Tr. 7:4–7; 31:17–19, *United States v. Kimelman*, No. 10 Cr. 56 (RJS) (S.D.N.Y. Oct. 12, 2011), Ex. W (imposing 30 month sentence on Guidelines range of 33 to 41 months); *Emanuel Goffer* Sentencing Tr. at 9:17–18; 28:19–22, Ex. D (imposing 36 month sentence on Guidelines range of 41 to 51 months); Sentencing Tr. at 33:19-20; 60:18-21, *United States v. Contorinis*, No. 09 Cr. 1083 (RJS) (S.D.N.Y. Dec. 17, 2010), Ex. M (imposing 72 month sentence on Guidelines range of 97 to 121 months); Sentencing Tr. at 7:25–8:3; 48:14–15, *United States v. Gansman*, No. 08 Cr. 471 (MGC) (S.D.N.Y. Feb. 8, 2010), Ex. X (declining to impose a Guidelines range sentence and instead imposing a sentence of one year and a day).

A.     **The Nature And Circumstances Of The Offenses Of Which Mr. Olan Was Convicted Warrant A Below Guidelines Sentence**

1.     **Role In The Offense**

We have rehearsed above Rob Olan's relative role in the offense.  In short, he was clearly the least involved of the Devices analysts in the 2012 radiation oncology trade, was not the driver of any of the conduct at issue, and was overall a Blaszczak skeptic.  He played no essential role in the conduct at issue, and it would have occurred in the same way it did had he simply not been present.

Courts regularly weigh the relative culpability of defendants in determining that a sentence should be set below the Guidelines range.  *See, e.g.*, Sentencing Tr. at 11:25–12:3, *United States v. Aleksejev*, No. 11 Cr. 878 (LAK) (S.D.N.Y. Oct. 10, 2013), ECF No. 43, Ex. E ("His level of culpability compared with the people who ran the scheme and conceived of this scheme is, though clearly not for criminal liability, not extensive"); *Chiasson* Sentencing Tr. at 57:11–19, Ex. F (providing that defendant's lesser degree of culpability factored into calculation of below Guidelines sentence); *Emanuel Goffer* Sentencing Tr. at 13:5–20; 27:19–24, Ex. D (sentencing defendant below the Guidelines range due, in part, to defendant's lesser culpability relative to the other defendants).   The Court should do so here.

2.     **Conviction Under Sections 1343, 1348, and 641 While Acquitted Under Section 10(b)**

Mr. Olan and his codefendants will be the first to be sentenced for insider trading having been acquitted of every Section 10(b) count with which they were charged.  We do not raise this to relitigate the jury charge debate, but to note simply that something unusual is occurring here: Mr. Olan was acquitted of every Title 15 securities fraud count (and not even charged by the SEC), while he has been convicted and must be sentenced on the same insider trading facts, cast

as violations of Sections 1343, 1348, and 641, each with different, and lesser, requirements than those that were found for all the other insider trading defendants convicted and sentenced in this District in the last ten years.  That is a circumstance that makes this insider trading case different from all others that have come before this Court, and we ask the Court to take that difference into account in determining a just sentence.

Accordingly, the Court should find that the circumstances of the offense and Mr. Olan's limited role in it warrant a sentence significantly below the Guidelines range.

### B.     Rob Olan Is Fundamentally A Good Person and His Core Characteristics Warrant A Sentence Significantly Below the Advisory Guidelines

Rob Olan is an exemplary human being.  He is, we respectfully submit, unlike most who stand before this Court to be sentenced.  The flood of letters submitted in support of Mr. Olan depicts a humble and kind man who is devoted to his family and his community, and who goes out of his way regularly to perform discrete acts of kindness.  The Court should consider these core components of Mr. Olan's character in arriving at a just sentence.

Section 3553(a) instructs courts to consider "the history and characteristics of the defendant" when crafting a sentence.  18 U.S.C. § 3553(a)(1).  In evaluating a defendant's character, courts consider a variety of factors, including the defendant's commitment to family, and the defendant's civic and charitable contributions.  *See Rita v. United States*, 551 U.S. at 364–65, 127 S.Ct. at 2473 (Stevens, J., concurring) ("Matters such as . . . family ties, or military, civic, charitable, or public service are . . . matters that § 3553(a) authorizes the sentencing judge to consider."); *see also Gordon v. United States*, No. 10 Cv. 5366 (KMW), 2011 WL 2638133, at *1 n.1 (S.D.N.Y. July 1, 2011) (noting the court's earlier 48-month downward variance under §3553(a) based, in part, on the defendant's "role in raising a strong family" and the history and characteristics of the defendant, which were "those of a good family man").  Indeed, courts in

this District routinely find that a defendant's good character, and history of generosity and community service merit a substantial downward variance from the advisory Guidelines range. *See, e.g.*, *Gupta*, 904 F. Supp. 2d at 353–55 (imposing 24 month sentence on Guidelines range of 78 to 97 months based, in part, the defendant's "extraordinary devotion, not only to humanity writ large, but also to individual human beings in their times of need" [54 month downward variance]); *Walters* Sentencing Tr. at 27:7–14; 29:17–30:13; 32:16–25, Ex. G (imposing 60 month sentence on Guidelines range of 97 to 121 months based, in part, on defendant's acts of charity [37-month downward variance]); Sentencing Tr. 29:6–12; 31:17–23, *United States v. Robert Stewart*, No. 15 Cr. 287 (LTS) (S.D.N.Y. May 4, 2016), ECF No. 95, Ex. H (imposing probation on Guidelines range of 30 to 37 months based, in part, on defendant's "very central role in his family" and generosity and pro bono service [30 month downward variance]); *Riley* Sentencing Tr. at 43:15–23, 49:11–13, Ex. I (imposing sentence of 78 months from Guidelines range of 121 to 151 months based, in part, on his donation of his time to charity [43 month downward variance]); *Chiasson* Sentencing Tr. at 53:3–54:5, Ex. F (78 month sentence imposed on Guidelines range of 97 to 121 months based, in part, on defendant's success in "building a family and building the kinds of relationships that are the true measure of a person" [19 month downward variance]); *Whitman* Sentencing Tr. at 6:18–19; 29:1–16, Ex. J (imposing 24 month sentence where Guidelines range was 51 to 63 months based, in part, on "credit" received for defendant's positive "dealings with other human beings as neighbors and friends" [26 month downward variance]); *Jiau* Sentencing Tr. at 39:12–19, 68:17–20, Ex. K (imposing 48 month sentence on Guidelines range of 97 to 121 months based, in part, on positive aspects of defendant's character [49-month downward variance]); *accord United States v. Johnson*, No. 16 Cr. 457 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) (imposing 24-month

sentence despite Guidelines range of 87 to 108 months because, among other things, "the letters I received from Johnson's family, friends, and colleagues make it clear that Johnson has a strong history of community involvement, including working with young people with adjustment issues. This record speaks well of Johnson and was important for my consideration" [63 month downward variance]).

The letters submitted to the Court demonstrate Mr. Olan to be a man broadly recognized for his integrity, generosity, and humanity. He is focused on his family and his community, and devotes his time and his fortune to caring for both. Many of his generous acts were anonymous and without any desire or expectation of recognition. (*See, e.g.*, Susan Olan Letter, Ex. A-2 (recounting how Rob arranged for a cab to drive home a lost hearing- and speech-impaired man); Andrew Javorsky Letter, Ex. A-6 (recounting how Rob helped his father help his sister purchase a home); Robert Tamashunas Letter, Ex. A-12 (recounting how Rob assisted a hurt child).) In short, Mr. Olan has lived his life humbly and with a commitment to caring for and serving others. We ask the Court to take this history into account when determining an appropriate sentence for Mr. Olan.

### C.    The Guidelines' Emphasis On Gain Leads To An Overstatement of Mr. Olan's Culpability And An Unjust Advisory Sentencing Range

However calculated, the trading gains are the primary driver of Mr. Olan's advisory Guidelines calculation. The Court should not allow the Guidelines' disproportionate emphasis on gain to unfairly affect Mr. Olan's sentence.

Judges in this District have repeatedly recognized that the Sentencing Guidelines place an "inordinate emphasis" on "putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge

weight to such factors."[8]  *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006)

(Rakoff, J.) (citing Kate Stitch & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in*

*the Federal Courts* 69 (1998) (concluding that the Sentencing Commission has never presented

empirical evidence or substantial argument to support the proposition that its rules achieve, even

imperfectly, any of the four well-established possible objectives of criminal sentencing)); *see*

*also Afriyie* Sentencing Tr. at 70:10–14, Ex. L ("[T]he guidelines sometimes tend to put undue

weight on factors that are quantifiable, like the amount of gain or loss monetarily . . . .").  Indeed,

the gains calculation has been called a "clumsy tool to measure … the seriousness of the crime."

*Contorinis*  Sentencing Tr. at 58:1–6, Ex. M.

 Circuit Judge Jon O. Newman testified before the Sentencing Commission that the

Guidelines' reliance on an incremental approach to culpability based on dollar amounts makes

"no penological sense" because the amount of loss often has little to do with the actions or

motivations of the defendant.  U.S. Sentencing Comm'n Public Hr'g Testimony and Transcripts

(July 9, 2009) (Statement of Judge Jon O. Newman), *available at* http://www.ussc.gov/

Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20090709-10/Newman_

testimony.pdf (last visited Aug. 18, 2018).  And as Your Honor has previously noted, "[t]he

application of the increases in offense levels dictated, for guidelines purposes, by the loss table in

financial crime cases sometimes are effectively quite arbitrary and have very little or only

modest relationship to the level of culpability of a particular defendant . . . ."  *Aleksejev*

Sentencing Tr. at 11:14–21, Ex. E.

---

[8] In recognition of the harshness of the loss tables guidelines, courts have routinely imposed below Guidelines sentences in fraud cases.  For instance, in 2017, 55.2% of fraud defendants received below Guidelines sentences. *See* U.S. Sentencing Comm'n, 2017 Sourcebook of Federal Sentencing Statistics, tbl. 27A, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2017/Table27A.pdf (last visited Aug. 21, 2018).  Notably, courts have imposed below Guidelines sentences in fraud cases without a request by the government in support 28.1% of the time.  *Id*.

This is particularly true in insider trading cases given that the Guidelines recognize that "victims and their losses are difficult if not impossible to identify" in insider trading cases and instead mandate the use of a gain calculation. U.S.S.G. § 2B1.4 cmt. background. While the loss amount may be considered a rough approximation for the seriousness of a theft-type fraud based on the level of harm to a known victim, the amount of gain in an insider trading case usually has no meaningful relationship to the harm caused by the offense, and certainly not to the culpability of the defendant. Indeed, the amount at issue "is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427–28 (S.D.N.Y. 2004) (Lynch, J.).

Judges in this District have time and again acknowledged that the offense level increase from insider trading gains can lead to excessive and unjust sentencing ranges. *See, e.g.*, *Gupta*, 904 F. Supp. 2d at 351 (Rakoff, J.):

> [T]he Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense. By making a Guidelines sentence turn, for all practical purposes on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, see 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face.

*See also Sean Stewart* Sentencing Tr. at 40:15–41:7, Ex. N (Swain, J.) (Guidelines range was "excessive" and "overstates the amount of custodial time necessary to punish Mr. Stewart . . . ."); *Riley* Sentencing Tr. at 6:25–7:5, Ex. I (Caproni, J.) ("[A]ssuming the government's calculation on the loss figure is correct, I intend to find that that creates a rationale for a variance because the loss figure ends up overstating the base criminality of Mr. Riley."); *Whitman* Sentencing Tr. at 9:12–18, Ex. J (Rakoff, J.) (Guidelines are "skewed irrationally" and "place[] too much emphasis, irrational emphasis, on the monetary portion of the determination of sentence . . . .");

*Fleishman* Sentencing Tr. at 11:11–21, Ex. O (Rakoff, J.) (S.D.N.Y. Dec. 21, 2011) (Sentencing Guidelines "do not really capture the reality of what's going on in many cases"); *Contorinis* Sentencing Tr. at 58:1–11, Ex. M (Sullivan, J.) (loss table "is a clumsy tool").

This "fetish with abstract arithmetic" also flies in the face of the specific aims of § 3553(a) because a myopic focus on the amount of gain necessarily results in disparate sentences for nearly identical conduct. *Adelson*, 441 F. Supp. 2d at 512. Considerations such as a defendant's role in the offense or whether he breached a duty of confidence can be virtually supplanted by the gain amount in calculation of the Guideline range. An individual who personally stole information and traded on it for his or her exclusive gain might face a lower Guidelines range than a remote tippee who himself breached no duty of confidence, but traded for the benefit of his investors and reaped little or no personal gain from the offense. Relatedly, the emphasis on gain also places defendants' sentences at the mercy of random factors outside of their control, such as the "vagaries of stock price movements." *See Rajaratnam* Sentencing Tr. at 31:4–11, Ex. P (Holwell, J.) (criticizing the Guidelines because they "particularly in financial crimes can point to widely disparate sentences that very similar offenses reflect depending on the vagaries of stock price movements and other factors that can ratchet up or down the guideline gain calculation.") Allowing such extraneous factors to dictate a defendant's period of incarceration is neither rational nor just.

In sum, this Court should not let a "clumsy tool" like the loss tables disproportionately inflate Mr. Olan's sentence and should instead look to the discretionary factors set out in 18 U.S.C. § 3553(a).

### D.      Mr. Olan Received a Tiny Portion of Deerfield's Trading Profits

The 2012 radiation oncology trade yielded $2,733,114 in total, based on the government's calculations.  Mr. Olan received 1.36% of Deerfield's trading profits in 2012 (6.8% of the 20% earned by Deerfield) or $37,170 from the 2012 radiation oncology trade.  We ask the Court to recognize, for purposes of sentencing, what a small portion of the yield on the trade came to Mr. Olan, and moreover to recognize that it would have been plain to Mr. Olan at the time that his personal benefit from the trade would necessarily have been only this tiny percentage of any overall gain.  A sentence driven by gain figures that bear no relationship to any possible motivation for the offense on Mr. Olan's part, and no relationship to harm caused by the offense, would be inappropriate.

### E.      Deterrence

While the Court is required to consider the need for the sentence in this case to address both specific and general deterrence, a below-Guidelines sentence will properly address both of these aims.

There is no need for a Guidelines sentence, or indeed any sentence of incarceration, to ensure that Mr. Olan never again comes close to the insider trading line.  Mr. Olan has no prior criminal history and there is no reason to believe he will have any future run-ins with the law. His professional reputation has been ruined by his conviction.  *See Adelson*, 441 F. Supp. 2d at 514 ("With his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct."); *see also* Sentencing Tr. at 54:3–6, *United States v. Gupta*, No. 11 Cr. 907 (JSR) (S.D.N.Y. Oct. 24, 2012), Ex. Q ("As to specific deterrence, it seems obvious that, having suffered such a blow to his reputation, Mr. Gupta is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result.").  Mr. Olan will

never work at an investment firm again and thus as a practical matter will not have the opportunity to engage in similar conduct in the future.  And as the letters show, Mr. Olan's character outside of this case demonstrates that the Court does not need to deter his future misconduct.  A term of imprisonment is thus not necessary to provide any additional specific deterrence.  *See Emmenegger*, 329 F. Supp. 2d at 428 (noting the diminished impetus for specific deterrence because the offenses at issue were "particularly adapted to [the defendant's] chosen career.  That career is over, and his potential to commit this particular type of crime has been eliminated.").

The need for general deterrence also does not weigh in favor of a Guideline sentence. The United States Attorney's Office has brought and won a highly publicized string of insider trading prosecutions over the past decade, and the general deterrence message is clear:  trading on inside information will result in prosecution.  No particular sentence is required in this case to reinforce the general deterrence message from that string of prosecutions.  As for the prosecution of trading on improperly obtained government information, the highly publicized prosecution and convictions in this case have provided ample notice to the investment community on that front.  The government has publicly touted this prosecution as bringing insider trading enforcement to traders' use of government information.  *See* Press Release, U.S. Atty's Office, S.D.N.Y., *Four Defendants Convicted In Manhattan Federal Court For Stealing Confidential Government Information And Using It To Engage In Illegal Trading* (May 4, 2018), https://www.justice.gov/usao-sdny/pr/four-defendants-convicted-manhattan-federal-court-stealing-confidential-government; Press Release, U.S. Atty's Office, S.D.N.Y., *Four Charged In Scheme To Commit Insider Trading Based On Confidential Government Information* (May 24,

2017), https://www.justice.gov/usao-sdny/pr/four-charged-scheme-commit-insider-trading-based-confidential-government-information.

Research has shown that deterrence is driven by the likelihood, rather than the length, of punishment.  *See* Office of Justice Programs, Nat'l Inst. of Justice, Five Things About Deterrence (June 2016), available at: https://nij.gov/five-things/pages/deterrence.aspx ("Research shows that the chance of being caught is a vastly more effective deterrent than even draconian punishment."); *see also* Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*, 61 Wayne L. Rev. 27, 49 (2015).  In fact, "there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."  *Adelson*, 441 F. Supp. 2d at 514 (citing Richard A. Frase, *A More Perfect System: Twenty-five Years of Guidelines Sentencing Reform* (Punishment Purposes), 58 Stan. L. Rev. 67, 72, 80 (Oct. 2005) ("Research has found that offenders are more sensitive to the probability of punishment than to its severity . . . .  White-collar and regulatory offenders are more likely to be deterred, even by selective enforcement and modest penalties; such offenders have many lawful alternatives and much to lose from being convicted, regardless of the penalty.")  This is particularly applicable to insider trading cases, where "imposing any sentence of imprisonment . . . has a great effect in and of itself."  Sentencing Tr. at 28: 4–9, *United States v. Koulouroudis*, No. 09 Cr. 440 (PGG) (S.D.N.Y. Apr. 9, 2010), ECF No. 31, Ex. R.

Further, the Sentencing Commission has itself acknowledged that the Guidelines were drafted, in part, to "ensure a *short but definite* period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve adequate deterrence."  U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing* 56 (2004)

(emphasis added; internal quotation marks omitted).  A lengthy period of confinement is unnecessary to ensure general deterrence.

In sum, a sentence significantly below the advisory Guidelines range would be sufficient, without being greater than necessary, to satisfy both general and specific deterrence.

### F.    A Sentence Significantly Below the Advisory Guidelines Range Is Necessary to Avoid Unnecessary Sentencing Disparities

A sentence significantly below the advisory Guidelines range, however calculated, is required here "to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  We highlight one particular, recent example of a sentence for more significant conduct that was substantially below the advisory Guidelines both as calculated by the Probation Department and as calculated by the defense.

Doug Whitman received a sentence of 24 months.  *Whitman* Sentencing Tr. at 29:15–16, Ex. J.  Whitman, like Mr. Olan, was a remote tippee and hedge fund employee.  His insider trading gain was calculated as $935,306 and his advisory Guidelines range was 51 to 63 months.  *See id.* at 6:18–19; 11:23–24; 23:17–19.  Whitman was in a position of authority, managing the $100 million hedge fund that bore his name.  *See id.* at 11:23–24; Gov't Sentencing Mem. at 2, *United States v. Whitman*, No. 12 Cr. 125 (JSR) (S.D.N.Y. Jan. 17, 2013), ECF No. 117.  He was the ultimate decision-maker and he played an active role in the offense conduct.  *See Whitman* Sentencing Tr. at 6:6–13, Ex. J.  And Whitman testified in his own defense and "repeatedly perjured himself."  *Whitman* Sentencing Tr. at 5:10–11, Ex. J. As Judge Rakoff observed:

> [T]he evidence was quite overwhelming that this sophisticated defendant, whose own company had a very detailed inside information prohibitory policy, was willfully, blatantly aware that he was trading on inside information every step of the way, in all the respects found by the jury, and, in this Court's independent view, amply supported by the evidence.  And that his denials on the stand were

directly contradicted not only by the testimony, but in some cases by highly specific information.

*Id.* at 5:11–19.  Yet Judge Rakoff still issued a below Guidelines sentence of 24 months, largely due to his appraisal of Whitman's character.  Judge Rakoff noted "[t]here is, in the common sense of it, and it's reflected in Section 3553(a) as well, a huge difference between a person who is essentially a grasping, evil, crooked, despicable human being and someone who is basically a good person but has made some intentional mistakes."  *Id*. at 27:25–28:4.  Judge Rakoff observed that "in his personal life, in his dealings with other human beings as neighbors or friends, there's nothing but positive things to be said about Mr. Whitman, and he gets credit for them on this day of judgment, because they were part of the man too."  *Id*. at 29:1–5.

Mr. Olan's conduct and character compare favorably in every respect to that of Whitman, and accordingly his sentence in fairness should be significantly below that imposed on Whitman. Mr. Olan was not the decisionmaker for the trade at issue, he was not the driver of any of the offense conduct, and his personal gain of $37,170 was roughly one-tenth that of Whitman, who personally pocketed $305,192 from his illegal trading.  Def. Sentencing Mem. at 23, *United States v. Whitman*, No. 12 Cr. 125 (JSR) (S.D.N.Y. Jan. 17, 2013), ECF No. 118.  Whitman was on tape encouraging his employees to break the law,[9] whereas there was no evidence that Mr. Olan pushed anyone to commit a crime.   And, of course, Mr. Olan did not perjure himself.

And finally, even with respect to character, Mr. Olan compares favorably to Whitman. The letters in support of Mr. Olan demonstrate he is a good and decent person at home and at work.  Whitman was described as "cavalier and crude in his business dealings."  *Whitman* Sentencing Tr. at 28:15–16, Ex. J.  Mr. Olan's work colleagues and peers emphasize his humility

---

[9]  Judge Rakoff referenced a recorded conversation in which Whitman stated "what you were getting from her was illegal to start with, so now you're getting ethical, that you shouldn't give her any cash?  . . .  I mean, let me ask you a question.  I have to assume the guy that you talked to from Cisco, who is your buddy, that you give him a bunch of nice wine every once in a while, right?"  *Whitman* Sentencing Tr. at 6:6–13, Ex. J.

and his understated demeanor, and his "deep commitment to intellectual rigor and to producing work that he could proudly stand beside."  (Howard Furst Letter, Ex. A-15; *see also, e.g.*, Douglas Godshall Letter, Ex. A-34 ("Rob was always one of the more respectful and professional investors from my vantage point."); Steven Pacelli Letter, Ex. A-27 ("I have always found [Rob] to be one of the most forthright and ethical people that I have known on Wall Street.").)

Basic fairness requires that Mr. Olan receive a sentence significantly lower than the 24 months imposed on Whitman.

## V.      MONETARY PENALTIES AND RESTITUTION

### A.      Criminal Forfeiture

No forfeiture application has been made at this time.  If the government makes such an application, we will address forfeiture in a supplemental submission.

### B.      Criminal Fine

The PSR provides that under 18 U.S.C. § 3571(d) the maximum fine is $14,285,512, equal to twice the amount of what the PSR purports the gain to be, $7,142,756, which appears to include profits from the 2012 radiation oncology trade, the 2009 radiation oncology trade, and the 2013 dialysis trades.  (*See* PSR ¶¶ 167–68.)  However, as the Court knows, under *Apprendi v. New Jersey*, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. 466, 490, 120 S.Ct. 2348, 2362–63 (2000); *see also United States v. Pfaff*, 619 F.3d 172, 174 (2d Cir. 2010).  Here, the jury made no findings as to the gain from any trade.  Accordingly, the maximum fine permissible under *Apprendi* is $1,250,000, that is, the statutory maximum under 18 U.S.C. § 3571(a)(3) for each of the five counts of conviction.  Although the PSR recommends

a fine of $500,000—more than twice the Guidelines maximum for offense level 20, § 5E1.2—an upward variance is unwarranted here.

### C.    Restitution

The Court should not order restitution here.  No trading victims of the offense have been identified, and while CMS is a putative victim, it suffered no actual loss of property compensable under the Mandatory Victims Restitution Act ("MRVA").  Mr. Olan has objected to paragraphs 170 and 171 of the PSR, which identify CMS as a victim under the MRVA and assign, without explanation, what is said to be the defendants' gain amount ($7,473,354), of which Mr. Olan "is accountable for $7,142,756", as the amount of CMS's compensable loss.  (PSR ¶¶ 170–71.)

Although the MRVA requires restitution for certain offenses, including offenses involving the loss of property by means of fraud, 18 U.S.C. § 3663A, "a sentencing court ordering restitution under the MVRA may not substitute a defendant's ill-gotten gains for the victim's actual loss."  *United States v. Zangari*, 677 F.3d 86, 93 (2d Cir. 2012).  In *Zangari*, the defendant was convicted of receiving approximately $65,000 in kickbacks in exchange for steering securities transaction to a firm that overcharged and was undercharged by Zangari's employers.  *Id.* at 88–89.  Zangari was ordered to pay restitution to his former employers in the full amount of his gain—$65,000.  *Id.* at 90.  On appeal, the Second Circuit held "that it was error to base the restitution order on Zangari's gain rather than the victims' actual losses."  *Id.* at 91.  Restitution "must be tied to the victim's actual, provable loss."  *Id.* at 91; *see also United States v. Maynard*, 743 F.3d 374, 378 (2d Cir. 2014) ("[O]nly a victim's 'actual loss' is compensable, not losses that are hypothetical or speculative.").  Under *Zangari*, the restitution amount in the PSR is plainly incorrect.

What's more, CMS sustained no actual loss of property compensable under the MRVA. The government acknowledged as much in a similar case involving misappropriation of government information.  Sentencing Tr. at 3:2–17, *United States v. Gross*, No. 15 Cr. 766 (GWG) (S.D.N.Y. Mar. 16, 2016), ECF No. 18, Ex. S.  As here, Gross was charged with providing information and documents belonging to the federal government to a former colleague. *See generally id*.  And in *Gross*, the government did not seek restitution "because the government's position is that restitution would not be appropriate given the difficulties with calculating the actual loss amount to the victim in this case."  *Id.* at 3:2–17.  So too here.  The charged conspiracy alleged the theft of CMS information about rules that were later proposed and adopted.  Any attempt to assign a value of the property CMS lost, if any, would be "speculative" or "hypothetical."  Accordingly, restitution under the MRVA is improper here.

**CONCLUSION**

Based on all of the above, we ask the Court to impose a non-Guidelines sentence that reflects the generous, humble, and selfless life lived by Mr. Olan, and that reflects his role in the offense and the limited benefits to him arising from the offense conduct found by the jury.  In closing, we quote the words of a friend and neighbor of Mr. Olan:

> I beseech the Court to exercise the quality of mercy. Rob's talents, skills and interests would be of far greater service benefiting the local New Jersey community in service to the many marginalized within our communities.  Rob has the capacity to change lives for the better.  Some people, after paying their debt to society, may be able, in a sense, to pick up where they left off.  That will never be precisely possible for Rob, and that alone will be a severe price for him to pay, in addition to whatever sentence he receives.

(Dorothy Whitehouse Letter, Ex. A-35.)

Respectfully Submitted,


  /s/ David Esseks   
David Esseks
Eugene Ingoglia
Tobias Fischer

Allen & Overy LLP
1221 Avenue of the Americas
New York, New York  10020
(212) 610-6300

*Counsel for Defendant Robert Olan*

Dated: New York, New York
      August 23, 2018